Linda LANGE, Plaintiff–Appellee,

v.

PENN MUTUAL LIFE INSURANCE COMPANY, Defendant–Appellant.

No. 87–1761.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 14, 1988.

Decided March 30, 1988.

As Amended June 8, 1988.

---

Leon D. Bess, Evans, Kitchel & Jenckes, P.C., Phoenix, Ariz., for defendant-appellant.

Robert J. Pohlman, Bonn & Pohlman, Chartered, Phoenix, Ariz., for plaintiff-appellee.

Before ANDERSON, NOONAN and THOMPSON, Circuit Judges.

DAVID R. THOMPSON, Circuit Judge:

A jury returned a verdict in favor of Linda Lange for $200,000 on her breach of contract claim against Penn Mutual Life Insurance Company. Penn Mutual had refused to pay Lange insurance proceeds from a policy of life insurance on the life of her former husband. The jury also awarded Lange $85,000 on her bad faith claim against Penn Mutual and $327,000 in punitive damages. In post trial proceedings, the district court awarded Lange attorney fees of $149,208.75. This award included an upward adjustment of 1.5 times the "lodestar" fee amount.

Penn Mutual appeals the jury's bad faith and punitive damage awards, and the court's award of attorney fees. We have jurisdiction under 28 U.S.C. § 1291. We affirm the award of damages for bad faith,

reverse the punitive damage award, and reduce the attorney fee award to the lodestar amount of $99,472.50.[1]

## I

## FACTS

In 1984, while Linda Lange was a resident of Arizona, she applied for and received a policy of life insurance issued by Penn Mutual on the life of her former husband, Dr. Michael Hogan. The policy provided that if Dr. Hogan died as a result of suicide within one year of the date the policy was issued, benefits would be limited to premiums paid. Dr. Hogan died within the year. He was killed when the car he was driving plunged over 300 feet into the Salt River Canyon in Arizona. Tire tracks indicated the car left a two-lane roadway and traversed an unpaved pullout area before going over the canyon's edge. The incident happened at night and the roadway was unlighted.

An investigator from the Arizona Department of Public Safety investigated the accident. He concluded that Dr. Hogan had committed suicide by intentionally driving over the edge of the canyon. This conclusion was based upon physical evidence at the scene and interviews with people who had known Dr. Hogan. An independent accident reconstruction expert, also employed by the State of Arizona, reached a different conclusion. He inspected the scene, reviewed photographs of the tire marks left by Dr. Hogan's car, and concluded that the evidence was consistent with either death by accident or death by suicide.

Dr. Hogan's death certificate, which was issued by the medical examiner of the State of Arizona, initially gave the "manner of death" as suicide. The death certificate was later amended to show the manner of death as "undetermined."

Lange applied for death benefits under the Penn Mutual policy on November 7, 1984. Her claim was denied by Penn Mutual on February 25, 1985. The denial was

---

1. Following the jury's verdict, Penn Mutual paid Lange's contract claim of $200,000 plus interest.

based upon (1) the original death certificate which listed the manner of death as suicide, and (2) the opinion of the Arizona Department of Public Safety investigator who concluded that Dr. Hogan had intentionally driven his car over the edge of the canyon. Lange then filed suit to recover the policy's proceeds. She later amended her complaint to add a bad faith tort claim based upon the alleged breach by Penn Mutual of an implied covenant of good faith and fair dealing. The lawsuit was originally filed in Arizona state court, and was removed by Penn Mutual to federal court on the ground of diversity of citizenship.

## II

## CHOICE OF LAW

■ The first issue we address is whether the district court correctly applied Arizona law to Lange's claims. We review the district court's determination of this question de novo. *Pereira v. Utah Transport, Inc.*, 764 F.2d 686, 689 (9th Cir.1985), *cert. dism'd*, 475 U.S. 1040, 106 S.Ct. 1253, 89 L.Ed.2d 362 (1986).

■ Although Lange was a resident of Arizona in 1984 when Penn Mutual issued the policy, she moved to Iowa shortly thereafter. She was living in Iowa in February 1985 when Penn Mutual denied her claim for the insurance proceeds. She was still in Iowa when her complaint was filed, and did not move back to Arizona until August 1986. Her trial began in December 1986.

Penn Mutual argues that the district court should have applied the law of Iowa to Lange's claims. It contends that if Lange suffered emotional and financial hardship as a result of Penn Mutual's denial of her claim for the proceeds of the policy, she suffered this injury while she was a resident of Iowa when her claim was denied. Moreover, an Amended Pretrial Order "approved as to form and content" by Lange's attorney, and bearing a September 1986 date, contains a statement that

Lange "is currently a resident of the State of Iowa."

Iowa has not as yet recognized an action in tort based upon the bad faith of an insurance company in a first party action.[2] *See, e.g., Hoekstra v. Farm Bureau Mut. Ins. Co.*, 382 N.W.2d 100, 111 (Iowa 1986); *Pirkl v. Northwestern Mut. Ins. Ass'n*, 348 N.W.2d 633, 635–36 (Iowa 1984). Such an action may be maintained in Arizona. *Bates v. Superior Court of Maricopa County*, 156 Ariz. 46, 749 P.2d 1367 (1988).

In this diversity case, we apply the choice of law rules of the forum state, Arizona. *Van Dusen v. Barrack*, 376 U.S. 612, 628, 84 S.Ct. 805, 815, 11 L.Ed.2d 945 (1964). Arizona has adopted the choice of law rules of the Restatement (Second) of Conflicts (1971). *Bates*, at 48, 749 P.2d at 1369; *Bryant v. Silverman*, 146 Ariz. 41, 42, 703 P.2d 1190, 1191 (1985).

Section 146 of the Restatement provides:
§ 146. Personal Injuries
In an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a *more significant relationship* under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

In *Bates*, the Arizona Supreme Court, sitting en banc, held that an insurance company's bad faith refusal to pay medical insurance benefits to an insured qualified as a "personal injury" under Arizona law. *Bates*, 156 Ariz. at 49, 749 P.2d at 1370. It would seem, therefore, that under Restatement § 146 a court should determine in which state the refusal to pay insurance benefits occurred and then examine the provisions of Restatement § 6. But the *Bates* court did not take this seemingly direct approach. Instead, before analyzing Restatement § 6, it first considered the general tort choice of law principles of Restatement § 145, as well as the specific

---

**2.** Claims brought directly against an insurer by its own insured are referred to as "first party" claims; those brought against the insured by a third person are called "third party" claims.

personal injury principles of Restatement § 146, and then applied the guidelines of both of these sections to the general principles listed in Restatement § 6(2). *Bates*, at 48–50, 749 P.2d at 1369–1371. We will do the same.

Restatement § 145 provides:

§ 145. The General Principle

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

 (a) the place where the injury occurred,

 (b) the place where the conduct causing the injury occurred,

 (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

 (d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

A. *The Place Where the Injury Occurred*

When Penn Mutual initially denied Lange's claim for the insurance proceeds, she was living in Iowa. In *Bates* the plaintiff allegedly suffered mental and physical distress when the insurance company terminated her benefits. This distress was an injury which the Supreme Court of Arizona stated occurred in Arizona where the plaintiff was then residing. *Bates*, at 49, 749 P.2d at 1370. But the court in *Bates* also noted that the insurance company "compounded these difficulties by failing to reconsider its decision, forcing plaintiff to sue the company," and that this also occurred while the plaintiff was residing in Arizona. *Id.* In our case, the injury which caused Lange to suffer emotional distress and financial hardship occurred not only when Penn Mutual initially refused to pay her claim. It was a continuing injury which occurred as Penn Mutual persisted in its refusal to reconsider the claim and pay it. This course of conduct occurred while Lange was in Iowa and continued after she returned to Arizona in August 1986. Thus, there are two states in which the injury occurred, Iowa and Arizona.

B. *Place of Conduct Causing the Injury*

Penn Mutual's home office is in Pennsylvania. It made its initial decision not to pay Lange's claim, and elected to stand pat on that decision, in Pennsylvania. Thus, the conduct causing the injury occurred in Pennsylvania.

C. *Domicil, Residence, Place of Incorporation and Place of Business of the Parties*

Penn Mutual's state of incorporation and principal place of business is Pennsylvania. Lange contends she was a resident of Arizona when she applied for the policy of insurance and that she remained a resident of Arizona notwithstanding her sojourn in Iowa. She points to the facts that when she moved to Iowa she left the majority of her personal belongings in storage in Arizona, paid rent for that storage in Arizona, did not register to vote in Iowa, and wrote a letter in which she stated that she was in Iowa only temporarily. Moreover, she notes that it is uncontested that before she moved to Iowa she was a resident of Arizona. She argues that under Restatement of Conflicts § 20 (1971) Penn Mutual had the burden of establishing that she changed her domicil to Iowa, and it did not carry that burden. We agree. Once Lange established that Arizona was her state of domicil, this domicil continued until it was superseded by a new one. *See In re Sherrill's Estate*, 92 Ariz. 39, 373 P.2d 353 (1962).

It also appears the district court concluded that Lange remained an Arizona resident. In granting partial summary judgment in favor of Lange on the choice of law issue, the district court stated that "[a]ll the balance of contacts tests weigh heavily

in favor of the plaintiff in this particular case. [Therefore] Arizona law should apply in all aspects to this case." (emphasis added). Consistent with this ruling, we also conclude that Lange continued to be a domiciliary of Arizona notwithstanding her temporary absence while she was living in Iowa.

### D. *Center of the Relationship, If Any, Between the Parties*

As in *Bates*, the relationship between Lange and Penn Mutual was grounded upon the insurance contract. In *Bates*, the insurance company initially accepted the plaintiff's claims under the policy and paid medical benefits to her while she was in Michigan. These benefits were paid from the company's home office in Ohio. When the plaintiff moved to Arizona, the insurance company continued the benefits for a period of time and then terminated them. The court in *Bates* reasoned that "[b]ecause an insured is normally far more mobile than the insurer, ... the relationship would seem to be centered at the insurer's home office." Applying this reasoning to the present case, the center of the relationship between Lange and Penn Mutual was Pennsylvania. *See Bates*, 156 Ariz. at 50, 749 P.2d at 1371.

■ The foregoing analysis of the factors of Restatement § 145 suggests that, quantitatively, the factors are fairly evenly divided among Arizona, Iowa and Pennsylvania. The determination of which state has the most significant contacts, however, is qualitative, not quantitative. *Bates*, at 49, 749 P.2d at 1370; *Bryant*, 146 Ariz. at 45, 703 P.2d at 1194. In this qualitative analysis, Restatement § 146, which is the more specific section dealing with personal injury actions, must be considered. Section 146 provides that the law of the state where the injury occurred is to be applied unless some other state has a more significant relationship to the occurrence and to the parties under the principles of Restatement § 6. In our case, the injury occurred in both Arizona and Iowa. Thus, still searching for an answer to the question of which state's law applies, we turn, as *Bates* teaches, to a consideration

of the general principles of Restatement § 6(2) (*see Bates*, 156 Ariz. at 48–50, 749 P.2d at 1369–1371). This section provides in relevant part:

§ 6. Choice-of-Law Principles

. . . . .

(2) ... [T]he factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability, and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Some of the factors listed in section 6(2) are neutral in our case. There is little, if any, involvement of the needs of interstate and international systems. And, while predictability and uniformity of result might differ among the three states, a consideration of this principle does not seem to be helpful in our case. Finally, any of the three states no doubt could determine and apply whatever law might be applicable.

■ It might be argued that the protection of justified expectations suggests the application of Arizona law (Restatement § 6(2)(d)). Lange was a resident of Arizona when she bought the policy, and Penn Mutual was doing business in Arizona when it issued the policy. Thus, the justified expectations of the parties would appear to be satisfied by application of Arizona law. But this is not a contract action. *See Bates*, at 50–51, 749 P.2d at 1371–1372. Lange's claim is in tort. It does not arise from a breach of an express covenant of the insurance contract. Her "claim arises, rather, from breach of a good faith covenant implied in law." *Bates*, at 50,

749 P.2d at 1371. In such a case, subsection (d) of Restatement § 6(2) is not applicable. *Id.*

 The remaining general principles of section 6(2), however, are applicable to this case and tip the scale in favor of applying Arizona law to Lange's claims. Arizona is the forum (Restatement § 6(2)(b)). Unlike either Iowa or Pennsylvania, Arizona provides compensation for insureds who suffer injury by bad faith insurance practices. *Cf. Noble v. National Am. Life Ins. Co.*, 128 Ariz. 188, 189–90, 624 P.2d 866, 867–68 (1981); *Hoekstra*, 328 N.W.2d at 111; *D'Ambrosia v. Pennsylvania Nat. Mut. Casualty Ins. Co.*, 494 Pa. 501, 507–508, 431 A.2d 966, 970 (1981). Only Arizona allows punitive damages to deter such conduct. These are basic tort law policies of the forum state, Arizona (Restatement § 6(2)(e)). *See* Prosser & Keeton on Torts, § 2 (5th Ed.1984) (The basic policies underlying the field of tort law are to provide compensation for the injured tort victim and to deter wrongful intentional conduct through the imposition of punitive damages).

The relevant policies of the other interested states, Iowa and Pennsylvania (Restatement § 6(2)(c)), do not suggest the laws of either should be applied. Iowa's failure so far to recognize insurance bad faith tort actions in first party suits protects its residents from these claims. Penn Mutual, however, is not a resident of Iowa. It is not incorporated there and it does not have its principal place of business there. Moreover, Iowa does not appear to have a strong policy against insurance bad faith actions, inasmuch as such actions are allowed there in the context of actions in tort by an insured against a liability insurer for bad faith processing of third party claims. *See Pirkl v. Northwestern Mut. Ins. Ass'n*, 348 N.W.2d 633, 635 n. 2 (Iowa 1984). As to Pennsylvania, it too has a policy of protecting insurers in its state from tort actions for bad faith insurance practices. Penn Mutual, however, conducts its insurance business on a national scale. Insurers who may be incorporated in Pennsylvania, or have their principal place of business there, but who choose to do business in any number of other states, become subject to the tort laws of the states in which they elect to do business. *See Bates*, 156 Ariz. at 50, 749 P.2d at 1371.

We conclude that Arizona has the most significant relationship to the occurrence and to the parties. Arizona law applies to Lange's claims.

## III

### BAD FAITH CLAIM

 Penn Mutual contends that, because the issue of whether Dr. Hogan committed suicide was "fairly debatable", it acted reasonably in denying Lange's claim and, therefore, the district court erred as a matter of law in submitting Lange's bad faith claim to the jury. Whether evidence is sufficient to create an issue of fact for the jury is a question of law reviewable by this court de novo. *See* C. Wright & A. Miller, *Federal Practice & Procedure*, § 2524 at 541 (1971); *Walker v. KFC Corp.*, 728 F.2d 1215, 1223 (9th Cir.1984) (whether evidence is legally sufficient to support a jury verdict is matter of law).

Arizona first recognized the tort of bad faith breach of an insurance contract in *Noble v. National American Life Ins. Co.*, 128 Ariz. at 190, 624 P.2d at 868:

> The whole purpose of insurance is defeated if an insurance company can refuse or fail, without justification, to pay a valid claim. We have determined that it is reasonable to conclude that there is a legal duty implied in an insurance contract that the insurance company must act in good faith in dealing with its insured on a claim, and a violation of that duty of good faith is a tort.

*Id.* In *Noble*, the Arizona Supreme Court established the rule that an insurer can challenge claims that are "fairly debatable," however it breaches its duty of good faith to its insured when it "intentionally denies or fails to process or pay a claim without a reasonable basis for such action." *Id.*

Relying on the above language from *Noble*, Penn Mutual contends that the evi-

dence it collected, together with the investigator's report which contained the opinion that Dr. Hogan intentionally drove his car over the edge of the canyon, raised at least a "fairly debatable" issue of suicide. According to Penn Mutual, it acted reasonably in denying Lange's claim and cannot be held liable for bad faith.

Were *Noble* the last word on this aspect of Arizona's insurance bad faith law, Penn Mutual might well be correct in its contention. Since *Noble* was decided, however, Arizona has further refined its law on the subject. In *Rawlings v. Apodaca*, 151 Ariz. 149, 726 P.2d 565 (1986), the Arizona Supreme Court stated that in order for an insurer to be liable for bad faith tort damages, it need only have acted intentionally without a founded belief that its conduct was permitted under the terms of the policy. *Id.*, 151 Ariz. at 160, 726 P.2d at 576. "The founded belief is absent when the insurer either knows that its position is groundless or when it fails to undertake an investigation adequate to determine whether its position is tenable." *Id.* In *Farr v. Transamerica Occidental Life Ins. Co.*, 145 Ariz. 1, 699 P.2d 376 (App.1984), cited with approval in *Rawlings*, Arizona's appellate court stated: "The prohibition against challenging a claim unless it is fairly debatable merely expresses the obligation to give equal consideration to the insured's interests." *Rawlings*, 151 Ariz. at 156, 726 P.2d at 572. *See also Tank v. State Farm Fire & Casualty Co.*, 105 Wash.2d 381, 715 P.2d 1133 (1986) (" 'an insurance company's duty of good faith [means] an insurer must deal fairly with an insured, giving equal consideration in all matters to the insured's interests' ") (quoted with approval in *Rawlings*, 151 Ariz. at 157, 726 P.2d at 573).

Applying these principles to the instant case, there was sufficient evidence of bad faith to submit this issue to the jury. The evidence of suicide was conflicting and inconclusive. Death could have been the result of accident or suicide. The investigator for the Arizona Department of Public Safety stated in his report that in his opinion Dr. Hogan committed suicide. There was physical evidence at the scene which arguably supported this conclusion. However, the accident reconstruction expert testified that the physical facts concerning Dr. Hogan's death were consistent with either accident or suicide, neither manner of death being more probable than the other. The medical examiner's amended report stated the manner of death was undetermined. Statements of lay witnesses were inconclusive, and there was evidence that Dr. Hogan may have been fatigued and drinking at the time his car went off the unlighted stretch of mountainous highway, across the unpaved pullout area, and into the canyon below.

A rational jury could have found that Penn Mutual chose to believe that Dr. Hogan committed suicide rather than an equally plausible alternative that he died as the result of an accident; that in so doing, Penn Mutual placed its own interests ahead of its policyholder, and "breached its duty to play fairly with [Lange] and to give [her] legitimate interests equal consideration." *Rawlings*, 151 Ariz. at 157, 726 P.2d at 573. *See Gurule v. Illinois Mut. Life & Casualty Co.*, 152 Ariz. 600, 734 P.2d 85 (1987) (Bad faith award against insurance company upheld; insurer denied insured's claim for disability benefits despite variance of medical opinions regarding insured's disability).

The portion of the judgment awarding Lange $85,000 in compensatory damages for bad faith denial of insurance benefits will stand.

## IV

## PUNITIVE DAMAGES

■ Under Arizona law, merely acting in bad faith toward an insured, without something more, will not subject an insurer to an award of punitive damages. *See Rawlings*, 151 Ariz. at 161, 726 P.2d at 577. The "something more" is an evil mind, which is satisfied by "evidence that defendant's wrongful conduct was motivated by spite, actual malice, or intent to defraud" or the defendant's "conscious and deliberate disregard of the interest and rights of others." *Gurule*, 152 Ariz. at 602, 734 P.2d at 87. The focus is on the wrongdoer's atti-

tude and conduct. Applying this standard, Penn Mutual's bad faith in initially denying, and in continuing to deny, Lange's claim did not rise to the level required for an award of punitive damages.

The court in *Rawlings* stated:

We do not believe that the concept of punitive damages should be stretched. We restrict its availability to those cases in which the defendant's wrongful conduct was guided by evil motives. Thus, to obtain punitive damages, plaintiff must prove that defendant's evil hand was guided by an evil mind. The evil mind which will justify the imposition of punitive damages may be manifested in either of two ways. It may be found where defendant intended to injure the plaintiff. It may also be found where, although not intending to cause injury, defendant consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others.

*Rawlings*, 151 Ariz. at 162, 726 P.2d at 578. Lange claims that Penn Mutual "consciously pursued a course of conduct knowing that it created a substantial risk of harm" when it denied Lange's claim. The court in *Rawlings*, however, further qualified the availability of punitive damages when it stated:

[Punitive] damages are recoverable in bad faith tort actions when, *and only when,* the facts establish that defendant's conduct was aggravated, outrageous, malicious or fraudulent (citation omitted). Indifference to facts or failure to investigate are sufficient to establish the tort of bad faith but may not rise to the level required by the punitive damage rule.

*Id.* at 162, 726 P.2d at 578 (emphasis in original). In *Linthicum v. Nationwide Life Ins. Co.*, 150 Ariz. 326, 330, 723 P.2d 675, 679 (1986) the Arizona Supreme Court stated:

It is only when the wrongdoer should be consciously aware of the evil of his actions, of the spitefulness of his motives or that his conduct is so outrageous, or intolerable in that it creates a substantial

risk of tremendous harm to others that the evil mind required for the imposition of punitive damages may be found.

*Id.* The fact that an insurer denies benefits based on apparently reputable, although conflicting, evidence is not in itself enough to show the evil mind necessary for punitive damages. *See Gurule*, 152 Ariz. at 607, 734 P.2d at 92.

In *Gurule*, the Arizona Supreme Court upheld a jury award of bad faith damages, but overturned the jury's award of punitive damages because there was no "overwhelming" medical evidence showing that the disability insurer denied benefits in conscious disregard of the insured's rights. Rather, there was conflicting evidence concerning the insured's medical disability and the insurer apparently considered its own interests above those of its insured by selectively viewing the evidence in its favor. The circumstances of the present case are analogous. The evidence that Dr. Hogan's death was not caused by suicide was not "overwhelming." *Cf. Little v. Stuyvesant Life Ins. Co.*, 67 Cal.App.3d 451, 136 Cal. Rptr. 653 (1977) (cited in *Gurule* as an appropriate case to award punitive damages; insured's claim for disability benefits denied by insurer, although the claim was supported by "overwhelming" objective medical evidence of disability).

Although the jury found that Penn Mutual acted in bad faith, the evidence is insufficient as a matter of law to support an award of punitive damages under Arizona law. The award of punitive damages is reversed.

## V

### ATTORNEY FEES

■ Following trial, Lange sought a discretionary award of attorney fees by the court pursuant to A.R.S. § 12–341.01. The amount sought was $245,126.02, ostensibly Lange's obligation to her attorney under her contingent fee agreement. In Arizona, a trial court may award reasonable attorney fees to the prevailing party in an action arising out of a contract. A.R.S. § 12–341.01. Under this statute, the Arizo-

na Supreme Court has upheld fee awards in insurance bad faith cases. *See Marcus v. Fox,* 150 Ariz. 333, 335–36, 723 P.2d 682, 684–85 (1986); *Noble,* 128 Ariz. at 193, 624 P.2d at 871.

In awarding fees to Lange in the sum of $149,208.75, the district court calculated the "lodestar" amount by multiplying the hours Lange's counsel spent on her case times his hourly rate. The lodestar amount was $99,472.50 and was essentially uncontested by Penn Mutual as to time spent, time required, and billing rate. The district court then applied a multiplier of 1.5 to this lodestar figure to arrive at the $149,208.75 fee award. Penn Mutual contends (1) the $149,208.75 attorney fee award should have been reduced by $59,000, the amount of attorney fees in evidence, because the jury must have included this amount in its award of compensatory damages, (2) the district court improperly awarded attorney fees under A.R.S. § 12–341.01(C), and (3) the use of the multiplier was an improper enhancement of the $99,472.50 lodestar amount. We review a district court's award of attorney fees for abuse of discretion. *See Beaudry Motor Co. v. ABKO Properties, Inc.,* 780 F.2d 751, 756 (9th Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 100, 93 L.Ed.2d 51 (1986).

### A. *Failure to Reduce Award by $59,000*

At trial, Lange presented uncontested evidence that she would incur attorney fees of $59,000 if she prevailed on her breach of contract claim. Penn Mutual argues that in instructing the jury on compensatory damages recoverable under Lange's bad faith claim, the district court left no discretion to the jury to award less than the full amount of these attorney fees. The court instructed the jury, in relevant part, as follows:

In the event that you find in favor of Linda Lange on her claim for bad faith, you must then award damages in an amount that will reasonably compensate for each of the following four elements of claimed loss or harm, provided that

you find that each was suffered by Linda Lange and caused by the acts or omissions on which you base your finding of liability.

One. Attorneys' fees reasonably incurred to recover Linda Lange's economic loss.... [3]

According to Penn Mutual, the jury necessarily awarded $59,000 as part of its $85,000 compensatory damages award; thus, it argues, $59,000 should have been deducted from the court's post-trial award of attorney fees to avoid a double recovery.

We agree with the district court that we cannot presume what amount, if any, of the $59,000 was included in the jury's award of compensatory damages. Although it is true that, absent a contrary finding, it must be assumed the court's instructions were followed (*Husky Refining Co. v. Barnes,* 119 F.2d 715, 717 (9th Cir.1941)), the court's instruction to the jury merely stated they were to award damages in an amount that would compensate Lange for certain elements of damage, including reasonable compensation for her attorney fees reasonably incurred to recover her economic loss. We cannot speculate from this instruction that the jury included the $59,000, or any specific portion of it, in its computation of compensatory damages. Accordingly, we cannot reduce the attorney fee award on this basis without engaging in speculation.

### B. *Arizona's Statute A.R.S. § 12–341.01(C)*

Penn Mutual further contends that the district court erred by awarding attorney fees as a punitive sanction under A.R.S. § 12–341.01(C) without having made the findings required under the statute. Section 12–341.01(C) states in relevant part:

Reasonable attorney's fees shall be awarded by the court in any contested action upon clear and convincing evidence that the claim or defense constitutes harassment, is groundless and not made in good faith.

*Filasky v. Preferred Risk Mut. Ins. Co.,* 152 Ariz. 591, 597–98, 734 P.2d 76, 82–83 (1987).

---

**3.** These fees were properly recoverable if Lange were to prevail on her bad faith claim. *See*

The gist of Penn Mutual's argument is that the district court, in basing its award on this provision, failed to make specific findings that the insurance company's defense constituted harassment, was groundless, and not made in good faith.

The district court's order does not suggest that it based its award of attorney fees upon A.R.S. § 12–341.01(C), but rather expressly provides that this statute was merely one factor the court considered in its determination of fees. The district court expressly relied on a number of different factors which it discussed at some length in its final order. In discussing these factors, the district court stated:

> One other factor to be considered by the court is the requirement of A.R.S. Sec. 12–341.01(C) which provides that "reasonable attorney's fees *shall* be awarded in any contested action upon clear and convincing evidence that the claim or defense ... is groundless and not made in good faith...." These findings are implicit in the jury verdicts.

(emphasis in original).

Arizona courts do not require a court to make specific findings as to the three elements of section 12–341.01(C). *Auman v. Auman*, 134 Ariz. 40, 653 P.2d 688 (1982), cited by Penn Mutual, is not to the contrary. Moreover, the fact that the district court failed to mention "harassment" when quoting the statute's relevant provision in its order is likewise not fatal to its award of attorney fees. In *Wistuber v. Paradise Valley Unified School Dist.*, 141 Ariz. 346, 350, 687 P.2d 354, 358 (1984), the Arizona Supreme Court implicitly interpreted section 12–341.01(C) as requiring any one of the enumerated factors.

### C. *Application of Multiplier to Enhance Fee*

▪ According to Penn Mutual, any upward adjustment of the lodestar amount was improper because Lange's attorney's billing rate "should be presumed to reflect accurately the skills, training, professional standing and experience of the attorney." Appellant's Opening Brief at 44.[4] Although the Arizona courts have had occasion to utilize the lodestar method of awarding "reasonable" attorney fees (*see, e.g., Jerman v. O'Leary*, 145 Ariz. 397, 701 P.2d 1205 (App.1985)), the issue of use of a multiplier or other fee adjustment has not yet been squarely addressed by the Arizona legislature or courts. We must therefore look elsewhere for guidance.

The Supreme Court has, in several recent opinions, addressed the issue of a court's determination of reasonable attorney fees pursuant to fee shifting statutes. *See Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Pennsylvania v. Delaware Valley Citizens' Council*, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986) (*Delaware Valley I*); *Pennsylvania v. Delaware Valley Citizens' Counsel*, — U.S. —, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) (*Delaware Valley II*). Although all of these cases involved attorney fee awards pursuant to *federal* fee shifting statutes, the common denominator for the statutory awards is that the attorney fee must be "reasonable." In Arizona, A.R.S. § 12–341.01 likewise provides for an award of "reasonable" attorney fees.

The Supreme Court first addressed the issue of determining a "reasonable" attorney fee in *Hensley*, 461 U.S. at 434, 103 S.Ct. at 1940. In adopting the lodestar approach of formulating a reasonable fee pursuant to 42 U.S.C. § 1988, the Court observed that "[t]he product of reasonable hours times a reasonable rate does not end the inquiry. There remain other considera-

---

**4.** Penn Mutual's citation to *Schweiger v. China Doll Restaurant, Inc.*, 138 Ariz. 183, 187–88, 673 P.2d 927, 931–32 (App.1983) for the proposition that "the rate charged by the lawyer to the client is the best indication of what is reasonable ..." is misplaced. *Schweiger* explicitly exempts from its consideration fee awards pursuant to A.R.S. § 12–340.01, as well as cases involving fees paid on other than an hourly basis. *Id.*, 138 Ariz. at 186 and n. 4, 673 P.2d at 930 and n. 4. In fact, *Schweiger* acknowledges that in those circumstances where the lodestar method is utilized, it is proper to adjust the lodestar amount up or down depending upon certain factors. *Id.* at n. 5.

tions that may lead the district court to adjust the fee upward or downward, including the important factor of the 'results obtained.'" One year later, in *Blum v. Stenson,* 465 U.S. at 897, 104 S.Ct. at 1548, the Court stated: "In view of our recognition that an enhanced award may be justified 'in some cases of exceptional success,' we cannot agree ... that an 'upward adjustment' is never permissible." The Court in *Blum* further stated, however, that when "the applicant for a fee has carried his burden of showing that the claimed rate and number of hours are reasonable, the resulting product is presumed to be the reasonable fee...." The court also stated that, although upward adjustments of the lodestar figure are permissible, such modifications are proper only in certain "rare" and "exceptional" cases, supported by both "specific evidence" on the record and detailed findings by the trial court. *See Id.,* 465 U.S. at 899–901, 104 S.Ct. at 1549–50. *See also* our decision in *Planned Parenthood v. State of Arizona,* 789 F.2d 1348, 1354 (9th Cir.1986) ("The Supreme Court's opinion in *Blum* predisposes us against the use of a multiplier unless the successful plaintiff has demonstrated that a lodestar amount does not represent a fully compensatory fee."). In *Delaware Valley I,* the Court further narrowed the scope of *Hensley* and *Blum* when it stated that "[b]ecause considerations concerning the quality of a prevailing party's counsel's representation normally are reflected in the reasonable hourly rate, the overall quality of performance ordinarily should not be used to adjust the lodestar, thus removing any danger of 'double counting.'" 106 S.Ct. at 3099. What is required is some "indication as to why the lodestar [does] not provide a reasonable fee award reflecting the quality of representation provided...." *Id.*

With the above principles in mind, we look to what evidence Lange presented and what findings the district court made in favor of upwardly adjusting the lodestar. In her memorandum supporting her application for an award of attorney fees, Lange stated that the "most critical factor" favoring an upward adjustment of the lode-

star amount was the degree of success achieved by the prevailing party. On this point, the trial court in its fee order stated "the results obtained were substantial and complete." As to the quality of Lange's counsel's work, the trial court stated:

> The quality of the representation and results obtained speak for themselves. The plaintiff prevailed on all issues. Indeed, were it not for the high quality of representation in the form of detailed correspondence to the defendant setting forth additional facts which should have been considered by the defendant in evaluating the claim, and the applicable law necessary to a determination of the suicide exclusion, there would not likely have been a bad faith award by the jury, indeed no recovery on the contract.

This recital indicates that the favorable result in this case was achieved due to the high quality of Lange's counsel's services. But no showing was made that the quality of these services was not reflected in the hourly rate on which the lodestar amount was based. Lange argues that her lawyer took her case on a contingency, and that an upward adjustment is appropriate to take into account the risk of loss. The district court addressed this. It stated:

> Evidence of the risk factor is the contingency agreement itself. The agreement required an assessment of the legal and financial burdens assumed by plaintiff and counsel in pursuing the action. The probability of success at the inception of the case, its complexity, the likelihood of recovering a substantial damage award and the number of hours necessarily devoted without guaranteed compensation as reflected by the 20% of the full amount of the contract and 45% of other monetary recovery show the analysis given by the plaintiff and her attorney. There is a better chance of recovery of the face amount than there was of the bad faith claim. Such a contingency, by itself, would not mandate an upward adjustment but is a positive factor.

We do not decide whether the contingency factor would have permitted an upward adjustment of the lodestar amount. We need not reach this question. The district

court concluded that the contingency factor, by itself, did not warrant an upward adjustment in the lodestar amount. We accept this determination. There was no other basis to apply a multiplier to enhance the fee award. There was no evidence that the hourly rate did not take into consideration the quality of Lange's counsel's representation, or that the hourly rate was less than customarily charged for similar services, or that this was the "rare" and "exceptional" case in which an upward adjustment was warranted (*see Blum v. Stenson*, 465 U.S. at 899–901, 104 S.Ct. at 1549–50). The fee award was made under A.R.S. § 12–341.01, which provides for an award of "reasonable" attorney fees. The lodestar amount is presumptively reasonable (*Blum* at 897, 104 S.Ct. at 1548), and Lange did not present evidence to the contrary. Accordingly, the fee award is reduced to the lodestar sum of $99,472.50.

## VI

## CONCLUSION

Under the principles enunciated in the Restatement (Second) of Conflicts (1971), Arizona has the most significant relationship to the occurrence and parties. The district court correctly applyied the law of Arizona to Lange's claims. Under Arizona law, there existed sufficient evidence of Penn Mutual's bad faith to warrant submitting this claim to the jury. Acting in bad faith to its policyholder does not necessarily subject an insurer to an award of punitive damages. Under Arizona law, Penn Mutual's wrongful conduct did not rise to the level required for an award of punitive damages. In awarding reasonable attorney fees, the district court erred in applying a multiplier of 1.5 to the lodestar amount, and the amount of the fee award is reduced to the lodestar sum.[5]

AFFIRMED IN PART, REVERSED IN PART, and REMANDED for entry of judgment consistent with this opinion.

5. Lange also moved, on appeal, to strike a portion of Penn Mutual's reply brief. The motion