818 P.2d 214

**Jack H. WALTER, Plaintiff–Appellee, Cross Appellant,**

v.

**F.J. SIMMONS and Others, d/b/a Underwriters at Lloyds, London, Defendant–Appellant, Cross Appellee.**

No. 1 CA–CV 89–401.

Court of Appeals of Arizona, Division 1, Department A.

Sept. 12, 1991.

Thur, Dawson & O'Sullivan by Steven A. Gruenemeier, Scottsdale, for plaintiff-appellee, cross appellant.

Teilborg, Sanders & Parks, P.C. by David J. Damron and Jean E. Huffington, Phoenix, for defendant-appellant, cross appellee.

## OPINION

JACOBSON, Judge.

Defendant-appellant F.J. Simmons and Others, d/b/a Underwriters at Lloyds, London ("Underwriters"), appeals from the judgment in favor of plaintiff-appellee Jack H. Walter ("Walter") following a jury verdict finding Underwriters liable for breach of an insurance contract and for breach of the duty of good faith and fair dealing. Walter cross-appeals from the trial court's directed verdict finding Underwriters not liable for punitive damages and from the remittitur imposed by the court.

## FACTS

On appeal from the judgment entered pursuant to the jury verdicts, we view the evidence in a light favorable to sustaining the verdicts. *Bradshaw v.*

*State Farm Mut. Auto. Ins. Co.*, 157 Ariz. 411, 414, 758 P.2d 1313, 1316 (1988).

On April 19, 1984, Walter was involved in a two-vehicle accident while driving his tractor-trailer truck on the highway near Benson, Arizona. Walter's truck was insured by Underwriters, a group of persons and syndicates operating out of London, England. In accordance with Underwriters' general business practices, the claim was first processed through Texas Specialty Underwriters. Texas Specialty assigned adjustment of the claim to Commercial Claims Service, an adjuster previously approved to handle claims against Underwriters. Commercial Claims Service was owned by David Potts ("Potts"). Because Potts estimated that the value of the claim in this case exceeded $10,000.00, Potts negotiated settlement of Walter's claim directly with one of the Underwriters: Hogg, Robinson–Gardner.

Walter asserted throughout the negotiations that the value of his truck was $42,500.00. Potts told Walter that the value of the truck was between $35,000.00 and $36,000.00. In connection with settling the claim, Potts obtained an estimate of the repairs the truck needed. The final repair estimate for the truck was $36,956.00. Potts also obtained a salvage bid of $12,000.00 for the truck from a friend, Paul Mann, in June 1984. Based on these figures, Potts determined that the cost of repair exceeded the cash value of the truck. In the latter part of June, Potts told Mann that Mann was the high bidder for salvage. Potts subsequently authorized Mann to retrieve the truck from the Kenworth facility in Phoenix where the truck was being stored. Mann retrieved the truck from Phoenix on August 9, 1984, and took it to his shop in Dallas, Texas. Mann later transferred the truck to a body shop.

On August 29, 1984, Potts sent Walter a proof of loss, specifying that the value of the loss was $34,500.00 and that this amount was in full satisfaction of Walter's claim on his policy. Walter refused to sign the proof of loss.

In early September 1984, Walter learned that his truck had been moved from the Kenworth facility in Phoenix. Walter's attorney then contacted Potts, requesting the location of the truck, which Potts refused to divulge. In March 1985, Walter's attorney again requested the location of the truck because negotiations for a settlement with the insurance carrier of the other vehicle involved in the April 1984 accident included salvage rights to the truck. In April 1985, Potts sent a letter to Walter's attorney, informing him that the truck was at Mann's shop in Dallas, Texas. Potts also told Walter's mother that the truck was at a Kenworth facility in Dallas. The truck, however, was not at either of those locations, but was found by friends of Walter's, stripped, in a wrecking yard in Dallas in mid-April 1985.

During these lengthy negotiations, Walter was unable to make payments on his truck and experienced other financial difficulties. In November 1985, the credit union that had a lien on the truck repossessed it. The credit union settled the claim with Potts for $34,500.00.

## PROCEDURAL HISTORY

Walter filed suit against Underwriters and Potts alleging three counts: (1) breach of the duty of good faith and fair dealing ("bad faith"), (2) breach of contract, and (3) conversion. A few days prior to trial, Walter voluntarily moved to dismiss the breach of contract and bad faith claims against Potts. These two claims were dismissed against Potts with prejudice. The trial proceeded against Underwriters on all three counts, and against Potts on the conversion count.

After Walter rested his case, Underwriters moved for a directed verdict on the issue of its punitive damages. The trial court granted the motion, ruling that punitive damages could not be imposed on a principal solely for acts of its agent. The court found that, although there was some evidence that would support imposition of punitive damages against Potts, there was no evidence of Underwriters' "evil mind" that would support punitive damages against Underwriters on either of the tort counts. However, the trial court denied

Underwriters' motion to dismiss the breach of contract and bad faith claims, ruling that Underwriters' liability on these counts was not wholly derivative from Potts' liability.

The jury returned a verdict finding that Underwriters had breached its duty of good faith and fair dealing, but had not breached the contract. On the conversion count, the jury assessed compensatory damages against Underwriters but not Potts, but assessed punitive damages against Potts. The trial court found these verdicts potentially inconsistent and instructed the jury to reconsider its verdicts. After further consideration, the jury returned its verdicts as follows: (1) in favor of Walter and against Underwriters on the breach of contract count, assessing $7,500.00 in actual damages and $11,250.00 in consequential damages; (2) in favor of Walter and against Underwriters on the bad faith count, assessing damages of $80,000.00; and (3) in favor of Walter and against Underwriters and Potts on the conversion count, assessing $7,500.00 in compensatory and $50,000.00 in punitive damages against Potts but no damages against Underwriters.

Following entry of judgment, Walter filed a motion for partial new trial on the issue of Underwriters' liability for punitive damages. Underwriters also filed a motion for new trial and a motion for judgment notwithstanding the verdict. The trial judge denied these motions, but conditioned the denial of Underwriters' motion for new trial on Walter's accepting a remittitur striking the jury's award of consequential damages in connection with the breach of contract count. The court then entered its second amended judgment, from which Underwriters appealed and Walter cross-appealed.

## DISCUSSION

### I. *Contract Claim*

#### A. Breach of Contract

Underwriters first argues that its obligations under the contract did not arise because Walter failed to file a required proof of loss, and, therefore, its motion for directed verdict on the contract claim was improperly denied. Second, it argues that, in any event, it fulfilled its obligation under the contract by offering and eventually paying the actual cash value of Walter's truck. We disagree.

■ One of Underwriters' claims managers testified that Underwriters would not settle a case without a proof of loss setting out the final negotiated amount of loss. Although there is conflicting evidence on this issue, there was evidence from which the jury could infer that Walter made an appropriate claim either for the repair or for the actual cash value of his truck, and that Potts would not accept a proof of loss other than the one Potts had completed that required Walter to accept $34,500.00 in full satisfaction of his claim. The jury could conclude from this evidence that the failure to file a completed proof of loss was the result of Potts' actions. Moreover, there is no prejudice to Underwriters in this case because the evidence shows that Underwriters and Potts had notice of Walter's claim and Potts had notice of the specific amount Walter was claiming. *Cf. Zuckerman v. Transamerica Ins. Co.*, 133 Ariz. 139, 146–47, 650 P.2d 441, 448–49 (1982) (insurer estopped from enforcing limitation clause when not prejudiced, when enforcement would work an injustice to the plaintiff, and would not serve purpose for which limitation clause exists).

■ Walter testified that the cash value of the truck at the time of the accident was $42,500.00. Underwriters eventually paid $34,500.00, $35,000.00 less a $500.00 deductible, to the credit union that repossessed the truck. The jury clearly accepted Walter's valuation of his truck, awarding him the $7,500.00 difference between the amount paid and the amount claimed on the breach of contract claim. Because there is evidence to support it, we will not reverse the jury's verdict on actual damages.

#### B. Resubmission of Verdicts

■ Underwriters also argues that the trial court erred in resubmitting the breach

of contract verdict to the jury after the jury had returned a verdict in Underwriters' favor. Underwriters contends that, because a breach of an insurer's covenant of good faith and fair dealing does not necessarily require a breach of contract, resubmission of the verdict was an improper comment on the evidence.

Initially, we assume that it might not be inconsistent for the jury to find in favor of Underwriters on the breach of contract claim and in favor of Walter on the breach of the duty of good faith and fair dealing claim. *See, e.g., Filasky v. Preferred Risk Mut. Ins. Co.*, 152 Ariz. 591, 597, 734 P.2d 76, 82 (1987) (delay in paying benefits under contract supports bad faith claim); *Rawlings v. Apodaca*, 151 Ariz. 149, 156, 726 P.2d 565, 572 (1986) (insurer's payment of entire amount of claim does not necessarily defeat bad faith claim). However, the trial court clearly explained to the jury that its verdicts were not necessarily inconsistent and resubmitted the case merely to allow the jury to reconsider the instructions previously given. Rule 49(c), Arizona Rules of Civil Procedure, authorizes the trial court to call to the attention of the jury a perceived nonresponsiveness and to send the jury back for further deliberations. The trial court's instructions to the jury on resubmission appropriately reflected the court's concerns, while still informing the jury that the verdicts were not necessarily inconsistent. This procedure was appropriate. *See Gomez v. Tucson Yellow Cab Co.*, 127 Ariz. 563, 565, 622 P.2d 510, 512 (App.1980); *Pelayo v. Bell*, 13 Ariz.App. 418, 420–21, 477 P.2d 537, 539–40 (1970).

In any event, Underwriters agreed to resubmission of the verdicts to the jury and approved the court's reinstruction prior to the jury's redeliberation. Underwriters' objection to the additional instruction after the jury had retired simply came too late.

### C. Remittitur of Consequential Damages

The trial court required a remittitur of the consequential damages on the breach of contract claim as an alternative to granting a new trial. Walter accepted the remittitur on the condition that it would be rescinded if an appeal were filed. Rule 59(i)(2), Arizona Rules of Civil Procedure. Walter argues on cross-appeal that the court erred in remitting the jury's award of consequential damages against Underwriters. In reviewing this issue, we consider only whether the trial court abused its discretion. *Duncan v. State*, 157 Ariz. 56, 63, 754 P.2d 1160, 1167 (App.1988).

Walter first contends that the trial court erred because Underwriters waived its right to obtain a remittitur by failing to object to either the jury instruction on consequential damages or the form of verdict that invited the jury to find consequential damages. In fact, Walter contends that Underwriters invited the alleged error when it specifically requested the instruction on consequential damages, from which the form of verdict was taken, *after* Walter had rested his case.

Although Walter's second amended complaint included a claim for consequential damages as an element of its breach of contract claim, Walter did not argue this claim to the jury in his opening statement. Moreover, according to Underwriters, Walter presented no evidence at trial of consequential damages. Nevertheless, after Walter had rested his case, Underwriters submitted its supplemental instruction no. 10, which instructed the jury that it must determine damages, in the event it found a breach of contract, considering (1) the unpaid benefits due under the contract and (2) the foreseeable consequential damages actually resulting from the breach. The trial court accepted this instruction, and the jury eventually returned a consequential damage award of $11,250.00.

Underwriters argues that it did not waive or invite any error on this basis because the instruction was a correct statement of the law, to which it has no objection; rather, Underwriters contends, the error was a result of the jury's finding of consequential damages despite insufficient

evidence to do so.[1]

In our opinion, however, by submitting the instruction on consequential damages despite the insufficiency of the evidence on that claim, Underwriters is deemed to have admitted that there was evidence to support the claim. *Van Dever v. Sears, Roebuck & Co.*, 129 Ariz. 150, 152, 629 P.2d 566, 568 (App.1981) (nonobjecting party is bound by the theory of the instructions given and is deemed to have admitted that there was evidence to support them); *Verdugo v. Po Shing Gee*, 4 Ariz.App. 113, 115, 417 P.2d 747, 749 (1966) (appellant who submitted instruction on contributory negligence admitted there was evidence to support the instruction). *But see Smith v. Moroney*, 79 Ariz. 35, 41, 282 P.2d 470, 474 (1955) (it is not necessary for a party to object to instructions submitting the opposing party's theory of the case in order to later assert insufficiency of the evidence on a motion for new trial). Despite Underwriters' attempt to divorce its insufficiency of the evidence argument from its proffered jury instruction, Underwriters effectively invited the error of which it now complains by inviting the jury to find consequential damages, knowing that it would be erroneous for the jury to do so. A party may not sit by and allow error to be committed and then move for a new trial on that ground when the judgment goes against it. *Southern Arizona Freight Lines, Ltd. v. Jackson*, 48 Ariz. 509, 518, 63 P.2d 193, 197 (1936); *Deer Valley Indus. Park Dev. & Lease Co. v. State*, 5 Ariz.App. 150, 153, 424 P.2d 192, 195 (1967). *See also Deese v. State Farm Mut. Auto. Ins. Co.*, 168 Ariz. 337, 342 n. 2, 813 P.2d 318, 323 n. 2 (App.1991).

Assuming, therefore, that Underwriters waived the issue of insufficient evidence to support a verdict of consequential damages or invited the error, we nevertheless do not believe that this determination ends our inquiry, although both parties conclude their analysis of this issue at this point.

When the waiver issue was argued to the trial court in connection with Underwriters' motion for new trial or remittitur, the court clearly indicated that it had decided to rule in Underwriters' favor notwithstanding any waiver of this issue. The court specifically explained its reasons for so doing: because there was absolutely *no* evidence, much less insufficient evidence, to support the award, and because the court felt that it might have contributed to the error when it resubmitted the verdicts to the jury. Thus, the underlying issue on appeal is whether a trial court can reach the merits of a motion for new trial or remittitur in favor of the moving party even though that party clearly waived or invited the error claimed.

A trial court has broad discretion in granting a new trial, particularly when it does so on the basis that the verdict was not justified by the evidence. *City of Glendale v. Bradshaw*, 114 Ariz. 236, 238, 560 P.2d 420, 422 (1977); *Fridena v. Evans*, 127 Ariz. 516, 522, 622 P.2d 463, 469 (1980) ("great" discretion given to trial court in determining whether evidence required an adjustment of the verdict). In determining whether that discretion has been abused, we must consider that "[t]he judge saw the witnesses, heard the testimony, knew the issues, and had a perspective on the relationship between evidence and verdict we can never achieve by a bare reading of the record." *Bradshaw*, 114 Ariz. at 238, 560 P.2d at 422; *see also Mammo v. State*, 138 Ariz. 528, 533–34, 675 P.2d 1347, 1352–53 (App.1983) (trial court has "greatest possible discretion" with regard to alteration of a verdict and grant or denial of motion for new trial because it had the opportunity to hear the evidence and observe the witnesses). If in fact there was no evidence to support the verdict, the court should vacate that judgment and order a new trial. *Villegas v. Bryson*, 16 Ariz.App. 456, 459, 494 P.2d 61, 64 (1972). This court will not disturb an

---

**1.** Underwriters clearly must posit its argument, both in its motion for new trial and/or remittitur and on appeal, so as to avoid an objection to the instruction. Absent fundamental error, failure to object to a jury instruction waives the issue of error in the instruction. Rule 51(a), Arizona Rules of Civil Procedure; *Bradshaw v. State Farm Mut. Auto. Ins. Co.*, 157 Ariz. 411, 419–20, 758 P.2d 1313, 1321–22 (1988).

order granting a new trial "unless the probative force of the evidence clearly demonstrates that the trial court's action is wrong and unjust and therefore unreasonable and a manifest abuse of discretion." *Cano v. Neill,* 12 Ariz.App. 562, 568, 473 P.2d 487, 493 (1970), *quoting Smith v. Moroney,* 79 Ariz. at 39, 282 P.2d at 472.

■ Consequential damages are "those damages caused by a breach of contract ... that can reasonably be supposed to be within the contemplation of the parties at the time of contracting." *Seekings v. Jimmy GMC of Tucson, Inc.,* 130 Ariz. 596, 601, 638 P.2d 210, 215 (1981). In an action for breach of contract, the burden clearly is on the plaintiff to prove the amount of his damages "with reasonable certainty." *Gilmore v. Cohen,* 95 Ariz. 34, 36, 386 P.2d 81, 82 (1963). Although "reasonable certainty" does not require "certainty in amount," "the plaintiff's evidence [must] provide some basis for estimating his loss.... [T]he evidence must make an 'approximately accurate estimate possible.'" *Id.; see also Short v. Riley,* 150 Ariz. 583, 586, 724 P.2d 1252, 1255 (App.1986) (requiring a reasonable basis in the evidence for the trier of fact to fix compensation). An award of damages cannot be based on conjecture or speculation:

> [T]he plaintiff in every case should supply some reasonable basis for computing the amount of damage and must do so with such precision as, from the nature of his claim and the available evidence, is possible.

*Gilmore,* 95 Ariz. at 36, 386 P.2d at 83.

■ Walter contends that the award of consequential damages was supported by evidence of his loss of time and inconvenience, loss of earning capacity, attorneys' fees incurred prior to his filing of this action, travel expenses, and interest accruing on the truck purchase loan. We need not belabor this opinion with an exhaustive recitation of the record as it relates to each piece of evidence claimed by Walter to support the $11,250.00 awarded by the jury as consequential damages. Rather, suffice it to say that, although Walter may have presented evidence of the fact that he suffered damage that could be deemed consequential, he presented absolutely no evidence from which a jury could reasonably compute the amount of this damage. Consequently, we believe the trial court reasonably concluded that the award of consequential damages was not supported by the evidence.

Because we find that the trial court correctly ordered a remittitur in this case due to a complete lack of evidence, we also find no abuse of discretion in the court's doing so despite Underwriters' waiver or invitation of the error. Moreover, as noted above, the court clearly stated as a reason for granting Underwriters' motion its belief that it may have caused the error by confusion upon resubmission of the verdicts to the jury. We believe that the court, realizing it may have caused the error of which Underwriters complains, may act to prevent a miscarriage of justice and order a new trial. *Cf. King v. Superior Court,* 138 Ariz. 147, 152, 673 P.2d 787, 792 (1983) (trial court that concludes it made an erroneous ruling may grant new trial to prevent miscarriage of justice).

## II. *Breach of Duty of Good Faith and Fair Dealing*

■ The duty of good faith and fair dealing is an implied provision of the insurance contract between Underwriters and Walter. *Rawlings,* 151 Ariz. at 153, 726 P.2d at 569. This duty requires that neither party act in such a way so as "to impair the right of the other to receive the benefits which flow from their agreement or contractual relationship." *Id.* at 153–54, 726 P.2d at 569–70. Although based on a contractual duty, the breach of this duty sounds in tort. *Noble v. National Am. Life Ins. Co.,* 128 Ariz. 188, 190, 624 P.2d 866, 868 (1981); *Trus Joist Corp. v. Safeco Ins. Co.,* 153 Ariz. 95, 104, 735 P.2d 125, 134 (App.1986). This tort arises when the insurer's conduct is "consciously unreasonable"—i.e., when the insurer knows it is acting improperly or when its improper actions permit such knowledge to be imputed to it. *Trus Joist Corp.,* 153 Ariz. at 104, 735 P.2d at 134.

## A. Dismissal of Potts

 Underwriters argues that the only evidence of acts of bad faith are those of Potts, and, because Underwriters' liability is derivative of Potts' liability, the trial court's dismissal of the bad faith claim against Potts requires dismissal of the claim against Underwriters. Underwriters supports this argument by citing to cases holding that, where a master's liability is solely derived from its servant, dismissal or a judgment in favor of the servant requires dismissal of the master. *See, e.g., Torres v. Kennecott Copper Corp.*, 15 Ariz.App. 272, 274, 488 P.2d 477, 479 (1971) (master not liable following dismissal with prejudice of servant where master's liability is based solely on servant's negligent acts). However, such cases do not apply to a tort based on a breach of a contractual duty of good faith and fair dealing where the agent was dismissed, not because he factually was innocent, but because he had no contractual duty to the plaintiff. Here, the principal's liability is not based on principles of respondeat superior; rather, the principal is liable because it breached its own contractual duty. *See Chaney Bldg. Co. v. City of Tucson*, 148 Ariz. 571, 573–74, 716 P.2d 28, 30–31 (1986) (because city's liability is not wholly derivative, dismissal of architect does not require dismissal of suit).

In this case, Potts was dismissed from the bad faith claim because he owed no contractual duty to act in good faith or deal fairly with Walter. *See generally Sparks v. Republic Nat'l Life Ins. Co.*, 132 Ariz. 529, 647 P.2d 1127 (1982), *cert. denied*, 459 U.S. 1070, 103 S.Ct. 490, 74 L.Ed.2d 632 (1982); *Farr v. Transamerica Occidental Life Ins. Co.*, 145 Ariz. 1, 699 P.2d 376

(App.1984). Because Underwriters' liability is not based upon respondeat superior, but is based on the breach of its own duty, dismissal of Potts does not require dismissal of the bad faith claim against Underwriters.

## B. Underwriters' Liability for Potts' Acts

 Underwriters argues that a principal can be only vicariously liable for the acts of a servant, and, accordingly, it cannot be held liable for bad faith based upon acts taken by Potts in connection with Walter's claim because Potts was not Underwriters' servant. Walter argues that a principal is liable at law for the acts of a non-servant [2] when the non-servant has undertaken the performance of a "non-delegable duty" of the principal. Walter contends that the duty of good faith is a "non-delegable" one and, therefore, Underwriters is liable for Potts' tortious acts notwithstanding the capacity in which he was acting.[3]

Initially, we note that no Arizona case specifically holds the duty of good faith is non-delegable. The concept of non-delegability is set out generally in the *Restatement (Second) of Agency* § 214 (1958), which provides:

> A master or other *principal* who is under a duty to provide protection for or to have care used to protect others or their property and who confides the performance of such duty to a servant or *other person* is subject to liability to such others for harm caused to them by the failure of such agent to perform the duty.

(Emphasis added.) Comment (e) further explains the intent of this section:

**2.** In connection with this argument, although there seems to be no dispute that Potts was not Underwriters' servant, there is some discussion in the briefs regarding whether Potts was Underwriters' agent or independent contractor. We acknowledge that ordinarily the liability of a principal for the acts of another is dependent upon the other's status as either a servant, agent, or independent contractor. *See generally Restatement (Second) of Agency*, historical note at 477–81 (1958). Because it is irrelevant for purposes of our analysis whether Potts was Underwriters' agent or independent contractor, we

simply refer to classifications between servants and non-servants, and to Potts' status as a non-servant.

**3.** Underwriters similarly argues that it cannot be vicariously liable for conversion based upon Potts' acts as a non-servant. However, we need not reach this issue because Underwriters was found not liable for damages on that count, so any error in this regard would not be prejudicial.

A master or other principal may be in such relation to another that he has a duty to protect, or to see that due care is used to protect, such other from harm although not caused by an enterprise which has been initiated by the master or by things owned or possessed by him. This duty may be created by contract....

Although the duty of good faith is inherent in any insurance contract, it is not strictly a contractual obligation; rather, it is an obligation imposed by law that governs the insurer in discharging its contractual responsibilities. *See generally Rawlings, supra.* An insured purchases the insurer's express agreement to pay certain types of claims as "security from financial loss which he may sustain from claims against him and protection against economic catastrophe in those situations in which he may be the victim." *Rawlings,* 151 Ariz. at 154, 726 P.2d at 570. One of the benefits flowing from this express agreement "is the insured's expectation that his insurance company will not wrongfully deprive him of the very security for which he bargained or expose him to the catastrophe from which he sought protection." *Id.* at 155, 726 P.2d at 571. Although not strictly a fiduciary, an insurer's duty of good faith is "of a fiduciary nature." *Id.*

We agree with Walter that an insurer who owes the legally imposed duty of good faith to its insureds cannot escape liability for a breach of that duty by delegating it to another, regardless of how the relationship of that third party is characterized. *See Timmons v. Royal Globe Ins. Co.,* 653 P.2d 907, 914 (Okla.1982). Clearly, an insurer may seek assistance by delegating *performance* of its duty of good faith to non-servants through whatever organizational arrangement it desires. In doing so, however, the insurer cannot give this delegate authority to deprive its insureds of

the benefit of the insureds' bargain. If the insurer were allowed to delegate the *duty itself,* an injured insured would have no recourse for breach of the duty against either the insurer, from whom the duty is owed, or its delegate, with whom the insured has no contractual relationship. *See generally Sparks, supra; De Montiney v. Desert Manor Convalescent Center, Inc.,* 144 Ariz. 6, 8–9, 695 P.2d 255, 257–58 (1985) (county may contract with other entities to provide mental health services but is liable for contractees' negligent acts because duty of care is non-delegable). Such a result would render a cause of action for breach of the duty virtually meaningless.

Thus, we hold that, although an insurer may delegate the *performance* of its duty of good faith to a non-servant, it remains liable for the actions taken by this delegate because the *duty* of good faith itself is non-delegable.[4]

### C. Sufficiency of the Evidence

■ Lastly, Underwriters argues that the evidence was insufficient to support the jury's verdict that Underwriters breached its duty of good faith. Viewing the evidence in the light most favorable to Walter and giving him all of the reasonable inferences arising from that view of the evidence, we will affirm if there is any substantial evidence from which reasonable persons could have found the ultimate facts to be as such as will sustain the verdict. *Pioneer Roofing Co. v. Mardian Constr. Co.,* 152 Ariz. 455, 462, 733 P.2d 652, 659 (App.1986).

Without going into an exhaustive recitation of the evidence, we agree with Walter that there was evidence from which the jury could conclude that Underwriters, through Potts, intentionally "fail[ed] to provide [Walter] with the security and pro-

---

4. For purposes of Underwriters' liability for bad faith, the trial court in this case instructed the jury to attribute to Underwriters those actions taken by Potts that were within the scope of his agency. As discussed above, the determination whether Potts was indeed Underwriters' "agent" is not relevant for purposes of this opinion. We merely note that comment (e) to *Restatement*

*(Second) of Agency* § 214 provides that, in cases of a non-delegable duty, "the fact that the one to whom the performance of the duty is delegated acts for his own purposes and with no intent to benefit the principal or master is immaterial." Consequently, any error with regard to this jury instruction was in Underwriters' favor.

tection from calamity which is the object of the relationship." *See Rawlings*, 151 Ariz. at 160, 726 P.2d at 576.[5] The evidence clearly allowed a jury to find that Potts, without authorization, moved Walter's truck from Phoenix, sold it for salvage, and then hid its whereabouts from Walter, knowing when he did so that Walter could not recover the value of the truck from the other driver involved in the accident without providing the other driver's insurer with the salvage rights to the truck. When Walter was able to locate the truck some time later, it had been substantially altered, thus destroying that portion of Walter's claim against the adverse driver. Additionally, a jury could have found that Potts lacked a reasonable basis for his offer of $35,000.00 for the truck and failed to reasonably investigate Walter's claim for $42,500.00 as his estimation of the truck's value. *See, e.g., Rawlings*, 151 Ariz. at 156, 160, 726 P.2d at 572, 576; *Noble*, 128 Ariz. at 190, 624 P.2d at 868. Finally, the evidence also indicated that over one and a half years lapsed from the date of the accident until Underwriters paid the credit union that held the lien on the truck, although Walter's negotiation of his collision claim had no effect on Potts' handling of the claim against Underwriters. A jury could have easily concluded from this evidence that Potts unreasonably delayed in processing Walter's claim. *See Rawlings, supra.*

Consequently, we find that reasonable persons could have concluded from the evidence that Underwriters breached its duty of good faith.

### III. *Punitive Damages: Bad Faith and Conversion*

■ After Walter rested his case, the trial court directed a verdict in favor of Underwriters on the issue of punitive damages, ruling that, although Underwriters could be held liable for Potts' actions when carrying out Underwriters' non-delegable duty of good faith, Underwriters could not similarly be held liable for Potts' actions for the purpose of assessing punitive damages against Underwriters. According to the trial court, the actions of an agent evidencing his "evil mind" cannot be imputed to the principal; therefore, in order to impose punitive damages against a principal under Arizona law, the principal must have had the requisite "evil mind" completely independent of the "evil mind" of its agent.[6] In directing the verdict on this issue, the court found that Walter did not present sufficient evidence under either its bad faith or conversion claims that Underwriters had an evil mind apart from Potts' actions.[7]

Walter argues on cross-appeal that the trial court erred in finding that Underwriters could not be held liable for punitive

---

5. We are somewhat disturbed by Underwriters' insistence, both in its opening and reply briefs, in arguing the facts and inferences therefrom in the light most favorable to its position. We agree with Underwriters that there must be substantial evidence from which reasonable persons could have reached the verdict they did. However, we disagree with the argument that there was no substantial evidence because, viewing the facts and inferences therefrom in Underwriters' favor, there was substantially *more* evidence supporting Underwriters' position than that of Walter's. We simply will not reweigh conflicting evidence on an appeal from a jury verdict; rather, we presume the jury accepted Walter's version of the evidence, and limit our review to whether there was substantial evidence from which a reasonable jury could have done so. *See generally Bianconi v. Lyall*, 78 Ariz. 409, 413, 281 P.2d 119, 122 (1955); *Pioneer Roofing, supra.*

6. Although we refer to punitive liability imputed to a principal because of an "agent's" acts, we do not mean to hold that Potts was indeed Underwriters' agent, as opposed to an independent contractor. *See discussion, supra*, n. 2.

7. Walter sought an award of punitive damages against Underwriters for both the torts of bad faith and conversion. As discussed above, Underwriters' liability for bad faith is predicated upon attribution of Potts' actions to Underwriters based on the non-delegability of Underwriters' duty of good faith. Contrarily, Underwriters' liability for conversion would be wholly derivative of Potts' actions. Because we decide that there was insufficient evidence to impose punitive damages against Underwriters under either count based upon Potts' actions, we need not discuss any potential distinction in the trial court's analysis between Underwriters' liability for punitive damages on the bad faith and conversion counts.

damages based on Potts' actions. We need not reach this issue, however, because we find that there was no evidence of Underwriters' "evil mind" sufficient to withstand the motion for directed verdict on this issue even if Potts' actions under either count *were* attributed to Underwriters. *Gary Outdoor Advertising Co. v. Sun Lodge, Inc.*, 133 Ariz. 240, 242, 650 P.2d 1222, 1224 (1982) (trial court will be affirmed if it reaches the correct result, even if it does so for an incorrect reason); *Zuck v. State*, 159 Ariz. 37, 42, 764 P.2d 772, 777 (App.1988).

 A trial court should grant a motion for directed verdict "if the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." *Orme School v. Reeves*, 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990). The burden of proof for punitive damages is by clear and convincing evidence. *Linthicum v. Nationwide Life Ins. Co.*, 150 Ariz. 326, 332, 723 P.2d 675, 681 (1986). Viewing the evidence and inferences therefrom in the light most favorable to Walter, therefore, we consider whether his case was so weak that reasonable people could not have found by clear and convincing evidence that Underwriters was liable for punitive damages based upon Potts' actions in handling Walter's claim. *See Baich v. Campbell*, 164 Ariz. 197, 199, 791 P.2d 1080, 1082 (App.1990).

 Something more than the conduct necessary to establish the tort is required to assess punitive damages against a defendant. *Rawlings*, 151 Ariz. at 161, 726 P.2d at 577; *Linthicum*, 150 Ariz. at 330, 723 P.2d at 679. Specifically, the inquiry focuses upon whether the defendant's wrongful conduct was guided by an "evil mind." *Rawlings*, 151 Ariz. at 162,

726 P.2d at 578; *Linthicum*, 150 Ariz. at 331, 723 P.2d at 680. A defendant's "evil mind" may be established by evidence that he either (1) intended to injure the plaintiff, (2) was motivated by spite or ill will, or (3) acted to serve his own interests, having reason to know and consciously disregarding a substantial risk that his conduct might significantly harm others. *Bradshaw v. State Farm Mut. Auto. Ins. Co.*, 157 Ariz. 411, 422, 758 P.2d 1313, 1324 (1988); *Gurule v. Illinois Mut. Life & Cas. Co.*, 152 Ariz. 600, 602, 734 P.2d 85, 87 (1987); *Rawlings*, 151 Ariz. at 162, 726 P.2d at 578; *see also Linthicum*, 150 Ariz. at 331, 723 P.2d at 680. The defendant's evil mind can be proven either by direct evidence or by evidence that his conduct was so oppressive, outrageous, or intolerable such that an evil mind can be inferred. *Bradshaw*, 157 Ariz. at 422, 758 P.2d at 1323; *Rawlings*, 151 Ariz. at 162–63, 726 P.2d at 578–79; *Gurule*, 152 Ariz. at 602, 734 P.2d at 87. *See generally* T. Schmidt, *Punitive Damages in Arizona: The Reports of Their Death are Greatly Exaggerated*, 29 Ariz.L.Rev. 599 (1987).

Walter argues that the following evidence supports an award of punitive damages against Underwriters: Potts' offer of only $35,000.00 for the truck; his sale of the truck for salvage without authorization; his refusal to disclose the location of the truck, thereby preventing Walter's settlement with the adverse carrier for the truck's value; and Potts' delay in processing the claim despite the knowledge that he was causing Walter financial hardship in doing so.[8] In our opinion, although this evidence was undoubtedly sufficient to establish Potts' liability for conversion and Underwriters' liability for bad faith, this evidence did not rise to the level necessary to award punitive damages against either Potts or, *a fortiori*, Underwriters.[9] There-

---

**8.** *See generally, supra,* n. 5.

**9.** As noted above, Potts did not appeal from the jury verdict finding him liable for $50,000.00 in punitive damages. Walter argues that *res judicata* prevents relitigation of the issue whether there was sufficient evidence to support the jury's finding; therefore, Walter argues, Underwriters is precluded on appeal from arguing

that the directed verdict against it was properly granted because there was insufficient evidence, even if Potts' actions are imputed to it, that Underwriters had an evil mind. Initially, we might agree with Walter that *res judicata* prevents relitigation of a final judgment, not only by the party against whom judgment was rendered, but also by those in privity with that

fore, we conclude that the trial court correctly directed a verdict in Underwriters' favor on this issue.

## IV. *Admission of Findings of Fact and Conclusions of Law from Related Trial*

Prior to trial in this case, Walter sued the driver of the other vehicle involved in the April 1984 accident. The trial court in that case made findings of fact and conclusions of law, declining to award Walter any amount for the damage to his truck because of his inability to introduce evidence as to the value of the truck. In this regard, that court specifically found:

> Plaintiff was unable to present any evidence of the complete destruction of his truck or of the extent of damage, if not completely destroyed[,] because the tractor was removed from the Phoenix Kenworth location by plaintiff's insurance company and taken to a location in Dallas, Texas, where plaintiff was able to observe the tractor only after it had been substantially altered. The acts of plaintiff's insurance company made it impossible for the plaintiff to present such evidence.

Underwriters filed a motion *in limine* seeking to preclude admission of these findings at the trial in this case. The trial court denied the motion and, over another objection by Underwriters, admitted the findings at trial "for the purpose solely of indicating what Judge Stover ruled in the other case." The court instructed the jury that neither Underwriters nor Potts was bound by the prior findings or the judgment in the prior case because they were not parties in that case.

On appeal, Underwriters argues that the trial court erred in admitting the findings from the prior case because it was unduly prejudiced thereby.[10] *See* Rule 403, Arizona Rules of Evidence. We will

not disturb such an evidentiary ruling absent an abuse of discretion, particularly one involving Rule 403. *Readenour v. Marion Power Shovel*, 149 Ariz. 442, 450, 719 P.2d 1058, 1066 (1986). Walter claimed throughout the trial that his lack of access to his truck thwarted his ability to recover against the at-fault driver. The trial court limited admission of the findings in the prior case solely as proof of what the ruling had been in that case. Under these circumstances, any error in admission of this exhibit was harmless.

## V. *Closing Argument*

Underwriters also argues that the trial court erred in failing to grant its motion for new trial based on Walter's counsel's improper closing argument. We disagree.

A new trial based on a claim of counsel misconduct is never granted as a disciplinary matter; rather, it should only be granted for a cause that materially affects the rights of the aggrieved party. *Grant v. Arizona Pub. Serv. Co.*, 133 Ariz. 434, 451, 652 P.2d 507, 524 (1982). The denial of a motion for new trial is a matter within the trial court's discretion. *Id.* We will find an abuse of discretion only when the record fails to provide substantial evidence to support the trial court's findings. *Id.* at 456, 652 P.2d at 529.

The first alleged impropriety in this case was counsel's reference to the trial court's denial of Walter's punitive damage claim against Underwriters. In denying Underwriters' motion for mistrial on this basis, the trial court found that counsel's reference was an attempt to explain why he was not asking for punitive damages against Underwriters in his closing argument when he had discussed this claim during his opening argument. In order to clarify the issue, the court allowed Underwriters to explain to the jury in its

party. *Armstrong v. Aramco Servs. Co.*, 155 Ariz. 345, 347, 746 P.2d 917, 919 (App.1987). However, Walter himself has appealed from the directed verdict in favor of Underwriters, and we may affirm *that* judgment if it is correct for any reason. Consequently, Underwriters is not precluded from arguing its non-liability for pu-

nitive damages because of insufficient evidence of Potts' evil mind.

**10.** Underwriters also contests the validity of the findings of fact, but the validity of these findings is not reviewable on this appeal.

closing argument the reason the punitive damage claim against it had been dismissed by the court.

The second alleged error occurred when counsel referred to the feasibility of collecting any judgment against Potts, who was not present at trial. The trial court agreed with Underwriters that this comment was clearly improper, but ruled that it probably was not prejudicial because, assuming from Potts' absence at trial, the jury "probably would have figured that out for themselves." Instead, the court instructed the jury to disregard the comment, explaining that it could not discuss the feasibility of collecting a judgment when considering imposition of damages against any defendant.

Underwriters argues that the reference to the likelihood of recovering from Potts, when combined with counsel's comment that punitive damages could only be imposed against Potts, effectively told the jury that, if they wanted to make a punitive award recoverable, they had better find some way to impose the award against Underwriters. Underwriters further argues that the jury did in fact find such a way by awarding Walter $50,000.00 in damages for emotional distress under the bad faith claim—a figure that was not suggested by either party and that coincided with the amount awarded against Potts for punitive damages.

Initially, we disagree with Underwriters that counsel's comment on the status of the punitive damage claim was necessarily improper. It seems entirely reasonable for a party who has detailed its claims to the jury at the start of a case to then detail any alterations in those claims at the end of the case. Further, whether this record reflects the success of the undoubtedly improper comment on the collectability of judgments when considered alone or in conjunction with the former comment is a matter of pure conjecture. Accordingly, we find substantial support in the record for the trial court's finding of lack of prejudice. *See Grant*, 133 Ariz. at 456, 652 P.2d at 529.

VI. *Comment on the Evidence and Misstatement of the Law*

█ Underwriters also argues that the trial court's explanation of the form of verdict on the conversion count constituted an improper comment on the evidence and misstatement of the law. Although acknowledging that the jury's verdict was in its favor on that count, Underwriters contends that the conversion and the bad faith counts were "inextricably intertwined," such that the improper comments on the former count prejudiced Underwriters on the latter count.

In explaining how to calculate an interest award should the jury find for Walter on the conversion count, the court stated:

> Let's just assume you decide that the truck was worth $42,500 and that they paid $35,000. The difference is $7500. . . .

> Let's assume you decide that there was a conversion on August 9. That was a date that was used. *I'm not telling you to do that*, but let's just assume August 9. If the conversion took place on August 9 and the value of the property less what was paid, or the equity, is $7500, then you have $7500 plus interest at what is the going rate under Arizona law, ten percent, from August 9, 1984.

(Emphasis added.) Finally, in explaining when the jury would use the form of verdict finding against Walter on the conversion count, the court stated:

> But let's assume for the sake of argument that based on your determination you decide they didn't prove a conversion; you decide that they were authorized to pick the truck up.

Underwriters contends that the court suggested that Underwriters needed more than a contractual right to move the truck, and that, without such authority, mere movement of the truck was a conversion. Underwriters further contends that the court suggested that the jury give undue weight to Walter's valuation of the truck.

Initially, we note that Underwriters did not object to either the allegedly improper or erroneous comment during trial, and therefore waived the issue on appeal. *Allied Van Lines, Inc. v. Parsons*, 80 Ariz.

88, 98, 293 P.2d 430, 436 (1956).[11] In any event, we disagree that the court improperly commented on the evidence or misstated the law. The court's comments referring to Underwriters' "authorized" possession of the truck simply do not direct the jury to find a conversion if Underwriters had no explicit direction from Walter to move the truck, despite any contract rights Underwriters might have had to do so. "Authorization" is sufficiently broad to encompass both oral and written consent. Moreover, we cannot read the court's instruction as a direction to the jury to find a conversion on August 9 if the truck was moved on that date, or to find that the truck was worth the amount claimed by Walter.

Nevertheless, given the tenuous relevance of these comments to the bad faith claim, any error clearly would not be prejudicial. *Jones v. Munn*, 140 Ariz. 216, 221, 681 P.2d 368, 373 (1984).

## CONCLUSION

For the foregoing reasons, we affirm the trial court on all issues raised by both the appeal and cross-appeal. We deny Underwriters' request for attorneys' fees. We make no ruling as to Walter's attorneys' fees, no request for such having been made by him. *See* Rule 21(c)(1), Arizona Rules of Civil Appellate Procedure.

BROOKS, P.J., and CONTRERAS, J., concur.

---

11. We note that Walter does not argue on appeal that Underwriters waived this issue by its failure to object.