**The MEDICAL PROTECTIVE COMPANY, a foreign corporation, Plaintiff,**

v.

**Herman PANG, M.D., Defendant.**

**No. CV 05–2924–PHX–JAT.**

United States District Court, D. Arizona.

Feb. 21, 2008.

1052

Steven Plitt, Daniel Maldonado, Kunz Plitt Hyland Demlong & Kleifield PC, Phoenix, AZ, for Plaintiff.

Timothy G. Kasparek, Timothy G. Kasparek PLLC, Goodyear, AZ, for Defendant.

## ORDER

JAMES A. TEILBORG, District Judge.

Pending before the Court is Plaintiff/Counter–Defendant Medical Protective Company's Motion for Summary Judgment (Doc. # 175) and Defendant/Counter–Plaintiff Dr. Herman Pang's Cross–Motion for Summary Judgment (Doc. # 179). The Court now rules on the motions.

## I. FACTUAL BACKGROUND

Medical Protective Company ("MPC") issued a medical malpractice policy to Dr. Pang for the policy term of July 17, 2001 through July 17, 2002. The policy had liability limits of $1,000,000 per claim and $3,000,000 in the aggregate. Dr. Pang paid a premium of $37,232 for the policy.

On December 3, 2001, Dr. Pang performed an aortic valve replacement procedure on Kymberli Williamson at John C. Lincoln Hospital ("Lincoln") in Phoenix. Ms. Williamson had difficulties coming off the pulmonary bypass. Ms. Williamson's mother said she spoke with Dr. Pang briefly after the surgery, but did not communicate with him again.

As a result of the surgical complications, Dr. Pang transferred Ms. Williamson to Dr. Copeland at University Medical Center in Tucson for follow-up care. After her transfer to Tucson and another surgery, Ms. Williamson suffered several complications: kidney failure, diffuse intravascular coagulopathy, gangrene of both hands, and cognitive, visual, and functional losses. Following Dr. Copeland's surgery, he issued an operative report containing critical statements about Dr. Pang.

In the report, Dr. Copeland stated that he felt that the valve Dr. Pang placed was too large. Dr. Copeland carbon copied Dr. Pang on this report, but Dr. Pang claims he never received it. Dr. Copeland later testified, however, that Dr. Pang's operative technique was appropriate and that the sizing of a prosthetic aortic valve involved the exercise of judgment by the surgeon. Dr. Copeland also testified that Dr. Pang's sizing of Ms. Williamson's valve was within the range of judgment of the surgeon and did not fall below the standard of care. Dr. Copeland further testified that Ms. Williamson's anti-phospholipid syndrome, undiagnosed at the time of her surgeries, at least contributed to her blood clots and other post-surgical complications.

On January 11, 2002, the Chairman of the Department of Surgery at Lincoln notified Dr. Pang that an outside physician would conduct a review of the Williamson case. Around February 4, 2002, the Chairman told Dr. Pang that the outside physician had completed the review and that the Chairman had requested corrective action regarding the Williamson case. Lincoln eventually appointed a peer review committee on August 29, 2002 to review the Williamson case. The actual peer review committee hearing did not take place until October of 2002.

In March of 2002, Dr. Pang asked Acordia of Arizona for premium quotes to increase his limits of liability. Dr. Pang claims he asked for the quotes after learning from Dr. Raniolo, another physician, that Dr. Pang could possibly increase his limits of liability for a modest increase in premium. Dr. Raniolo testified he did not remember having that specific conversation with Dr. Pang, but that physicians frequently discuss medical malpractice insurance and premiums.

On March 14, 2002, after obtaining premium quotes, Dr. Pang sent a letter to Acordia requesting an increase in his insurance liability limits with MPC from $1,000,000 to $5,000,000 per incident. Also in the spring of 2002, Dr. Pang and his wife did some estate planning that included creating a trust and transferring property to Dr. Pang's wife. Such a transfer could protect Dr. Pang's personal assets from judgments. Dr. Pang maintains that the estate planning had nothing to do with the Williamson surgery because he didn't even know about Williamson's claim until August of 2002.

On June 10, 2002, Pang filled out an increase in coverage form, requesting that the increase be retroactive to March 14,

2002, the date he sent the letter requesting the increase in coverage. At issue in this case are the answers to three questions from that form: 1) "Do you have knowledge of any claims or potential claims, or suits in which you may become involved, but have not previously reported to the Medical Protective Company?"; 2) "Since your retroactive date, has any non-hospital peer review organization notified you that they were investigating your care of any patient?"; and 3) "Since your retroactive date, has any hospital peer review committee reviewed one or more of your cases?" Dr. Pang answered "No" to these three questions. MPC accepted Dr. Pang's request and on July 3, 2002, increased his limits to $5,000,000 per incident and $5,000,000 in the aggregate for the July 17, 2001–2002 policy period, retroactive to March 14, 2002. MPC renewed Dr. Pang's policy for the July 17, 2002–2003 period with liability limits of $5,000,000 per incident and $5,000,000 in the aggregate.

Ms. Williamson sued Dr. Pang for malpractice in state court on July 25, 2002. Dr. Pang first received notice of the lawsuit in a letter dated August 23, 2002 from Elliot Grysen, counsel for Ms. Williamson. After MPC received notice of the suit, it assigned the defense of Dr. Pang to Mr. James Broening. In July of 2007, the jury in the Williamson case returned a verdict for Dr. Pang.

Policy information forwarded to Mr. Broening on September 9, 2002, indicated that the Williamson lawsuit was being defended under the July 17, 2002–2003 policy with liability limits of $5,000,000 per incident and $5,000,000 in the aggregate. MPC sent a reservation of rights letter to Dr. Pang on September 18, 2002. The letter advised him that compensatory damages in the case could exceed his liability limits, that the policy did not cover punitive damages, and that Dr. Pang had the right to retain an attorney of his own choice to protect his potential uninsured interest.

Lincoln hospital conducted an ad hoc peer review committee hearing regarding the Williamson case in October 2002. The committee concluded that Dr. Pang's care of Williamson was appropriate. Dr. Pang has never lost hospital privileges as a result of peer review.

After reporting the Williamson case and another case to MPC, on June 12, 2003, Dr. Pang requested a decrease in his liability coverage back to $1,000,000 per claim and $3,000,000 in the aggregate, effective July 17, 2002. Dr. Pang claims he requested the decrease some time after having a discussion with Dr. Joseph Auteri regarding the general state of malpractice suits against physicians. Dr. Auteri opined that physicians should carry minimal amounts of malpractice coverage because large limits invited more malpractice suits. Dr. Auteri testified during his deposition that he remembered that conversation.

Additionally, in May of 2003, Dr. Pang received a renewal premium notice for $72,744, which represented an approximate 44% increase from the previous premium of $50,731 for the same amount of coverage. Dr. Pang claims that as a result, he sent a letter to Acordia requesting the decrease in his coverage effective as of the renewal date, July 17, 2003. The reduction in coverage limits reduced Dr. Pang's premium to $50,731, roughly equal to the amount he had paid during the previous policy period for $5,000,000/$5,000,000 limits.

Anthony Ball, a Regional Vice–President of MPC, reviewed and analyzed the Williamson case in April 2004. As part of the review, Mr. Ball reviewed Mr. Broening's case file, including Dr. Pang's deposition. William Meadows, the claims person for MPC on the Williamson case, requested a

reserve increase near the end of 2004. In response, Mr. Ball again reviewed the Williamson case at the end of 2004 through the beginning of 2005. As a result of this second review, Mr. Ball began an investigation into the circumstances surrounding Dr. Pang's 2002 request for an increase in coverage.

On February 1, 2005, MPC conducted an intra-company review of the Williamson case. As a result of that review, Mr. Ball instructed Mr. Meadows to obtain documents from the underwriting file for determining how Dr. Pang responded to questions regarding peer review and potential claims when requesting increased coverage limits. Some time in February of 2005, Mr. Meadows obtained the documents, advised Mr. Ball of the information they contained, and delivered the documents to David Sherman, a MPC attorney. At the direction of Mr. Sherman, MPC's General Counsel's office opened a coverage file.

On March 7, 2005, Mr. Meadows sent an email to Dr. Pang's attorney, Mr. Broening, via his assistant, asking, "Have you been able to learn when the peer review was held. You indicated it was regarding a couple of matters." Mr. Ball also called Mr. Broening requesting information.

In response to Mr. Ball's call, Mr. Broening sent the following letter to Mr. Ball on April 1, 2005:

> You have requested input regarding when Dr. Pang first became aware of the Williamson claim. I have discussed this issue with Dr. Pang and enclose a copy of correspondence from Plaintiff's counsel, B. Elliot Grysen, dated August 23, 2002, which was to the knowledge of Dr. Pang, the first time that he was aware of legal action or an intention to hold him responsible for damages.
>
> As you know, this matter did undergo peer review in the Spring of 2002 along with a couple of other cases as a part of the hospital peer review and credential-

ing process. That peer review process, in Arizona, is completely privileged and nothing can be disclosed about which cases were reviewed, the participants, the issues involved, etc. other than the outcome. The outcome of peer review was that Dr. Pang was found to have performed properly in the cases under consideration.

> Hopefully, this adequately responds to your inquiry. Please let me know if you need anything more.

(MPC's Exh. # 32). Mr. Broening testified at his deposition that at the time he sent the April 1 letter, he did not know that MPC was investigating whether to rescind Dr. Pang's increased coverage because of answers on the increased coverage form. Had he known of MPC's investigation, Mr. Broening testified that he would have referred Dr. Pang to other counsel to avoid a conflict of interest.

Mr. Ball responded to Mr. Broening's letter in an email dated April 1, 2005, which read, "Thank you for forward [sic] along the attached letter from Mr. Grysen. Before receiving this notice, we had made additional enquiries through other sources and obtained additional information. This matter is now in the hands of Stephen Plitts [sic], as counsel for Medical Protective." (Pang's Exh. # 20).

MPC filed the pending rescission claim against Dr. Pang in September of 2005. Steven Plitt, attorney for MPC, sent Dr. Pang a letter on October 14, 2005 claiming that Dr. Pang knew that Ms. Williamson was going to pursue a claim against him when Dr. Pang completed the request for an increase in coverage. Mr. Plitt stated that because Dr. Pang had concealed that knowledge, MPC had instituted a partial rescission claim against him. MPC had not notified Dr. Pang of its coverage investigation at any time prior to Mr. Plitt's letter.

MPC has moved for summary judgment on its claim for rescission and on Dr. Pang's counterclaim for bad faith. In his cross-motion for summary judgment, Dr. Pang requests summary judgment on both MPC's claim for rescission and his counterclaim for bad faith and punitive damages. The Court will address the rescission claim first, then the counterclaim for bad faith.

## II. LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c). Thus, summary judgment is mandated, ". . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Initially, the movant bears the burden of pointing out to the Court the basis for the motion and the elements of the causes of action upon which the non-movant will be unable to establish a genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548. The burden then shifts to the non-movant to establish the existence of material fact. *Id.* The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Id.* at 247–48, 106 S.Ct. 2505. However, in the summary judgment context, the Court construes all disputed facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir.2004).

## III. RESCISSION CLAIM

MPC seeks partial rescission of the policy issued to Dr. Pang pursuant to A.R.S. § 20–1109, reducing the limits of Dr. Pang's policy from the $5,000,000/$5,000,000 limits to $1,000,000/$3,000,000 limits. Section 20–1109 of the Arizona Revised Statutes provides:

All statements and descriptions in any application for an insurance policy or in negotiations therefor, by or in behalf of the insured, shall be deemed to be representations and not warranties. Misrepresentations, omissions, concealment of facts and incorrect statements shall not prevent a recovery under the policy unless:

1. Fraudulent.

2. Material either to the acceptance of the risk, or to the hazard assumed by the insurer.

3. The insurer in good faith would either not have issued the policy, or would not have issued a policy in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or otherwise.

 To rescind based on an insured's misrepresentation on an insurance application, the insurer must prove all three conditions of A.R.S. § 20–1109. *Valley*

*Farms, Ltd. v. Transcontinental Ins. Co.*, 206 Ariz. 349, 78 P.3d 1070, 1074 (Ariz.Ct. App.2003).[1] The insurer must prove that the insured committed actual or legal fraud that was material to the insurer's accepting the risk. *Id.* The difference between actual fraud and legal fraud is one of intent. *Russell v. Royal Maccabees Life Ins. Co.*, 193 Ariz. 464, 974 P.2d 443, 450 (Ariz.Ct.App.1998) (internal citations omitted). "Actual fraud requires an intent to deceive while legal fraud does not." *Id.*

■ Legal fraud exists if:

[T]he question [asked in an insurance application] is one where the facts are presumably within the personal knowledge of the insured, and are such that the insurer would naturally have contemplated that his answers represented the actual facts, if the representation be false, the insured is guilty of legal fraud, although as a matter of fact he may not have intended to deceive the insurer; but where the question is of such a nature that a reasonable man would know that it represented merely the opinion of the insured, there must be an actual intent to deceive and bad faith on the part of the insured.

*Valley Farms*, 78 P.3d at 1074. The insurer therefore must prove an intent to deceive, or actual fraud, when a response to a question on an insurance application is merely an expression of opinion. *Russell*, 974 P.2d at 450.

■ Whether a question calls for a factual response or an opinion depends on the evidence in the case and is a question of fact for the jury, unless reasonable persons could not differ regarding whether the answer was a statement of opinion or fact. *Equitable Life Assur. Soc. of the U.S. v. Anderson*, 151 Ariz. 355, 727 P.2d 1066, 1070 (Ariz.Ct.App.1986). A question also may elicit responses of mixed fact and opinion. *Stewart v. Mut. of Omaha Ins.*, 169 Ariz. 99, 817 P.2d 44, 49 (Ariz.Ct.App. 1991). With that brief background of A.R.S. § 20–1109, the Court will turn to the specific questions and answers at issue here.

## A. Knowledge of Claim or Potential Claim

■ MPC argues that Dr. Pang committed fraud, actual or legal, when he answered "No" to the following question: "Do you have knowledge of any claims or potential claims, or suits in which you may become involved, but have not previously reported to the Medical Protective Company?" MPC argues that Dr. Pang had sufficient information to indicate a "potential claim" by Williamson that he should have disclosed. Dr. Pang claims that the "potential claim" question calls for an opinion and that, in his opinion, he had exercised proper care and did not believe that the Williamson surgery would result in a malpractice claim.

The question regarding a current claim obviously elicits a factual response. It is undisputed that Dr. Pang did not know about the Williamson lawsuit when he filled out the application. Dr. Pang completed the form in June of 2002, and Ms. Williamson did not institute suit until the end of July 2002. No legal "claim" existed until then.

The question remains whether Dr. Pang answered honestly regarding his knowledge of potential claims. MPC argues that, among other things, Dr. Pang's knowledge of the review of the Williamson case by the outside physician and that the Chairman of Surgery at Lincoln had requested a peer review committee on the

1. The insurer must prove all three conditions by a preponderance of the evidence. *Am.*

*Pepper Supply Co. v. Federal Ins. Co.*, 208 Ariz. 307, 93 P.3d 507, 510 (2004).

Williamson claim demonstrate he knew of a potential claim. MPC further argues that Dr. Copeland's criticism of the Williamson surgery and Dr. Pang's financial planning in March indicate he knew that the Williamson surgery might result in a medical malpractice claim.

Dr. Pang argues that complications from surgery frequently arise, and surgical complications do not indicate an unacceptable standard of medical care. He also argues that he never received Dr. Copeland's critical operative report. Dr. Pang further argues that his estate planning, which involved transferring personal assets to his wife, had nothing to do with the Williamson surgery. Dr. Pang felt that he exercised the proper standard of medical care when he operated on Ms. Williamson. Therefore, in his opinion at the time of the application, the Williamson situation did not constitute a potential legal claim. Further, before the letter from Ms. Williamson's attorney, Dr. Pang claims he had not received any indication from Ms. Williamson or her representatives that she intended to file suit.

Again, whether a question calls for a factual response or an opinion depends on the evidence in the case, which the trier of fact generally decides. *Russell*, 974 P.2d at 450. MPC has not proven that reasonable persons could not differ regarding whether Dr. Pang's answer was a statement of fact or a statement of opinion. The Court therefore finds that the jury should decide whether the potential claim question called for a factual response, an opinion, or a mixture of the two.

MPC could still prevail on its motion, however, if it has proven as a matter of law that Dr. Pang intended to deceive MPC with his answer. Dr. Pang has provided sufficient evidence to create a factual

issue regarding his intent at the time of the application. Dr. Pang has not proven as a matter of law, however, that he did not intend to deceive MPC. Enough evidence exists from which a reasonable juror could conclude that Dr. Pang intended to deceive MPC. If the jury finds that the question called for an opinion, and therefore that MPC must prove actual intent to defraud, then factual issues remain regarding Dr. Pang's intent at the time he filled out the application.

Alternatively, if the jury found that the question elicited a factual response, then MPC would have to prove only legal fraud.[2] Legal fraud requires proof that Dr. Pang's answer to the question was false. *Equitable Life*, 727 P.2d at 1070. MPC has not proven as a matter of law that Dr. Pang answered the question falsely, nor has Dr. Pang proven as a matter of law that he answered truthfully. The record evidence indicates that questions of fact remain regarding the falsity of the answer.

■ MPC has proven as a matter of law, however, that Dr. Pang's answer to the claim/potential claim question was material to its decision to authorize the increase in liability limits. Materiality exists if the facts, if truly stated, might have influenced a reasonable insurer in deciding whether to accept or reject the risk. *Central Nat'l Life Ins. Co. v. Peterson*, 23 Ariz.App. 4, 529 P.2d 1213, 1216 (1975). MPC's underwriter has testified that if MPC had known of the potential Williamson case, that knowledge definitely would have influenced whether MPC approved the increased limits. Dr. Pang has not contradicted that assertion. The Court holds that no reasonable juror could find that a "Yes" answer to the potential claim

**2.** A.R.S. § 20–1109 requires the insurer to prove either actual or legal fraud. Legal

fraud is easier to prove, but the insurer can always attempt to prove actual fraud.

question would not at least influence MPC's decision regarding the increased limits.

But Dr. Pang has presented evidence that MPC might have approved the increase in limits even if it had known of the circumstances surrounding the Williamson surgery. MPC initially issued Dr. Pang's medical malpractice policy even though it knew of the Burrell medical malpractice claim, and it did not exclude that claim from coverage. MPC's underwriting policies do not mandate an automatic refusal of the request if the doctor answers "Yes" and provides other information. Based on the record, the Court finds that fact questions remain regarding whether MPC would have approved the increase in limits if it had known about the Williamson surgery, the third element of A.R.S. § 20–1109.

### B. Non-hospital Peer Review Organization

 MPC contends that Dr. Pang committed fraud by again answering "No" to the following question: "Since your retroactive date, has any non-hospital peer review organization notified you that they were investigating your care of any patient?" The question elicits a statement of fact. MPC therefore must prove only legal fraud. Legal fraud requires a false response. *Equitable Life*, 727 P.2d at 1070.

Dr. Pang explains that non-hospital peer review organizations are generally freestanding surgery centers or healthcare insurers that credential their physicians. Reviews by an outside physician, on the other hand, are part of the hospital review process. Dr. Pang has testified that between March 14, 2002 and June 10, 2002, the period at issue, no non-hospital review organizations notified him of an investigation. MPC has in no way refuted that claim. The Court therefore finds as a

matter of law that Dr. Pang answered the above question truthfully. MPC cannot prove legal fraud. Given the lack of any evidence that a non-hospital peer review organization reviewed Dr. Pang, MPC also cannot prove intent to deceive, or actual fraud. Dr. Pang's answer to the non-hospital review question will not proceed to trial.

### C. Hospital Peer Review Committee

 Dr. Pang answered "No" as well to the last question at issue in this case: "Since your retroactive date, has any hospital peer review committee reviewed one or more of your cases?" Lincoln's peer review committee hearing regarding the Williamson surgery undisputedly did not occur until after Dr. Pang completed the application for increased benefits. Dr. Pang has testified that no hospital peer review committee convened on any of his other cases either during the relevant time period.

MPC has introduced evidence that some type of review, for example, review by an outside physician, of two of Dr. Pang's cases occurred during the relevant time period, March 14–June 10, 2002. Dr. Pang has testified that while that might be true, none of those reviews involved a hospital peer review *committee*. MPC has not introduced any evidence that creates a material issue of fact regarding that assertion. The Court therefore finds as a matter of law that MPC cannot prove legal fraud in connection with the peer review committee question because Dr. Pang's answer was technically true.

But MPC might still prove actual fraud, *i.e.,* intent to deceive. Dr. Pang knew in February of 2002 that the Chairman of Surgery at Lincoln had recommended corrective action on the Williamson case. Even though the peer review of the Williamson case had not occurred at the time

Dr. Pang completed the request form, the evidence indicates he knew that it would occur in the future. A reasonable juror could determine that Dr. Pang's failure to disclose the upcoming peer review under those circumstances evidenced an intent to deceive MPC. Alternatively, a reasonable juror could conclude that Dr. Pang answered the question honestly and that he did not intend to deceive MPC. Whether Dr. Pang intended to deceive MPC with his answer to the peer review committee question remains an issue of fact for trial.

Like the first question, MPC has proven as a matter of law that the answer to the peer review question would influence its decision to approve the increased limits. Also like the first question, however, MPC has not proven as a matter of law that it would not have approved the increased limits if Dr. Pang had answered "Yes" to the peer review question and elaborated on that issue. Dr. Pang has presented evidence that MPC originally granted him coverage despite pending claims. Also, MPC's underwriting policies do not call for an automatic denial of benefits if the physician answers "Yes" to the question and provides more information. That evidence sufficiently creates a fact issue regarding what MPC's ultimate decision would have been if Dr. Pang had answered "Yes" to the peer review question.

### D. Reservation of Rights

■ Dr. Pang argues that MPC's failure to properly communicate a reservation of rights precludes MPC from bringing its partial rescission claim. MPC defended Dr. Pang in the underlying Williamson suit. It did so under a reservation of rights letter that warned Dr. Pang that the compensatory damages in the case could exceed his coverage, that the policy would not cover punitive damages, and that he had the right to retain his own counsel to defend his potentially unprotected liability.

■ "An insurer with a coverage defense must defend its insured under a properly communicated reservation of rights or it will lose its right to later litigate coverage." *United Services Auto. Assoc. v. Morris*, 154 Ariz. 113, 741 P.2d 246, 249 (1987). But the insurer does not need to reserve its rights immediately upon learning of a lawsuit. *Id.* at 250. The insurer can subsequently reserve its rights upon learning new information that would provide a coverage or policy defense. *Id.*

MPC notes that the reservation of rights requirement applies to coverage defenses. MPC does not argue that a policy provision, for instance, an intentional act exclusion, obviates coverage. Rather, MPC argues that Dr. Pang's misrepresentations on the request form entitle MPC to rescind the increase in liability limits.

MPC therefore draws a distinction between the present case and the cases cited by Dr. Pang, which all involved policy coverage defenses. Dr. Pang has not cited a case in which the court refused to allow a claim for rescission because the insurer did not specifically mention fraud in its initial reservation of rights. MPC did not even learn of the alleged fraud until well after it defended Dr. Pang. MPC instituted the present action within approximately nine months of first opening an investigation into Dr. Pang's answers on the form. The Court finds that MPC should not be estopped from seeking rescission based on fraud just because it did not "preserve" fraud in its initial reservation of rights letter.

On the rescission claim, the following issues remain for trial: 1) whether the potential claims question elicited a statement of fact or opinion or both; 2) whether Dr. Pang committed actual or legal fraud when he answered "No" to the potential claim question; 3) whether MPC

would have approved the increased limits if Dr. Pang had reported the circumstances surrounding the Williamson surgery; 4) whether Dr. Pang intended to deceive MPC when he answered "No" to the hospital peer review committee question; and 5) whether MPC would have increased Dr. Pang's policy limits if he had answered "Yes" to the peer review question.

## IV. BAD FAITH COUNTERCLAIM

### A. Communications with Mr. Broening

■ Dr. Pang has counterclaimed against MPC for bad faith. Dr. Pang bases his bad faith claim on the inquiries made of Mr. Broening and what Mr. Broening's response reveals about those inquiries. The Court finds that the facts alleged create an issue of fact for the jury regarding MPC's bad faith.

MPC began investigating Dr. Pang's answers to the request for increase form in January of 2005. On February 1, 2005, MPC conducted an intra-company review of the Williamson case. As a result of that review, Mr. Ball instructed Mr. Meadows to obtain documents from the underwriting file for determining how Dr. Pang responded to questions regarding peer review and potential claims when requesting increased coverage limits. Some time in February of 2005, Mr. Meadows obtained the documents, advised Mr. Ball of the information they contained, and delivered the documents to David Sherman, a MPC attorney. At the direction of Mr. Sherman, MPC opened a coverage file.

On March 7, 2005, Mr. Meadows sent an email to Dr. Pang's attorney, Mr. Broening, via his assistant, asking, "Have you been able to learn when the peer review was held. You indicated it was regarding a couple of matters." Mr. Ball also called Mr. Broening requesting information.

MPC paid Br. Broening to defend Dr. Pang in the Williamson case.

In response to his inquiries, Mr. Broening sent the following letter to Mr. Ball on April 1, 2005:

You have requested input regarding when Dr. Pang first became aware of the Williamson claim. I have discussed this issue with Dr. Pang and enclose a copy of correspondence from Plaintiff's counsel, B. Elliot Grysen, dated August 23, 2002, which was to the knowledge of Dr. Pang, the first time that he was aware of legal action or an intention to hold him responsible for damages.

As you know, this matter did undergo peer review in the Spring of 2002 along with a couple of other cases as a part of the hospital peer review and credentialing process. That peer review process, in Arizona, is completely privileged and nothing can be disclosed about which cases were reviewed, the participants, the issues involved, etc. other than the outcome. The outcome of peer review was that Dr. Pang was found to have performed properly in the cases under consideration.

Hopefully, this adequately responds to your inquiry. Please let me know if you need anything more.

(MPC's Exh. # 32).

■ In third-party insurance situations, such as MPC's defense of Dr. Pang against Ms. Williamson, the insured surrenders to the insurer the right to control and manage the defense of claims made against him. *Rawlings v. Apodaca,* 151 Ariz. 149, 726 P.2d 565, 570 (1986). Implicit in the relationship between the insurer and insured is the insurer's duty to play fairly with its insured, or, its duty of good faith. *Id.* In defending its insured, the duty of good faith requires that the insurer give equal consideration to the protection of the insured's interest as well as its own

interest. *Acosta v. Phoenix Indem. Ins. Co.*, 214 Ariz. 380, 153 P.3d 401, 404 (Ariz. Ct.App.2007). To prevail on a bad faith claim, the insured must prove that the insurer both acted unreasonably and knew that it acted unreasonably or acted with such reckless disregard that such knowledge may be imputed to it. *Id.*

Dr. Pang argues that MPC's attempt to elicit information from Mr. Broening, the attorney it hired to represent Dr. Pang, to use against Dr. Pang in a coverage dispute violated its duty of good faith. Dr. Pang contends that MPC placed its interests above Dr. Pang's by attempting to use Mr. Broening's confidential relationship with Dr. Pang to help it deny coverage. MPC argues that it did not obtain and did not attempt to obtain any confidential or privileged information; therefore, it did not violate its duty of good faith and fair dealing. Both parties cite *Parsons v. Cont'l Nat'l Am. Group*, 113 Ariz. 223, 550 P.2d 94 (1976).

In *Parsons*, the insured minor brutally assaulted his neighbors, named the Parsons. *Id.* at 95. The insurer's claims representative, Candelaria, investigated the incident. *Id.* at 95–96. The insureds hired Howard Watt to represent them. *Id.* at 96. Candelaria concluded that the minor did not have control of his senses when he attacked the Parsons, and he advised the insurer to attempt to settle the claim. *Id.*

On October 13, 1967, the Parsons sued the minor for assault and his parents for negligent failure to restrain the minor and obtain the medical and psychological attention he needed. *Id.* At the time they filed, the Parsons made a settlement demand offer of $22,500, which the insurer rejected as completely unrealistic. *Id.* The insurer's retained counsel undertook the insureds' defense and also continued to communicate with the insurer. The retained lawyer wrote: "I have secured a rather complete and confidential file on the minor insured who is now in [a] maximum-security institution with facilities for psychiatric treatment.... The above referred-to confidential file shows that the boy is fully aware of his acts and that he knew what he was doing was wrong. It follows therefore, that the assault he committed on claimants can only be a deliberate act on his part." *Id.*

After the insurer received that news, it sent a reservation of rights letter to the insureds saying it would defend them, but that it was not waiving any of its coverage defenses. *Id.* The letter stated that it was possible that the fact finder would conclude that the minor acted intentionally, and that the policy did not cover intentional acts. *Id.* The insurer sent this letter only to the parents, not to the minor. *Id.*

The court directed a verdict in favor of the insured parents on the negligence claim and against the minor on the assault claim. *Id.* The judge entered a verdict against the minor in the amount of $50,000. *Id.* at 97. The Parsons then garnished the insurer in attempt to recover the judgment. *Id.* The insurer successfully defended the garnishment action by claiming that the intentional act exclusion precluded coverage. *Id.* The same attorney who had represented the minor represented the insurer in the garnishment action. *Id.*

On appeal, the Parsons argued that the insurer should be estopped to deny coverage because it waived the intentional act exclusion by taking advantage of the fiduciary relationship between the minor and the attorney it hired to represent the minor. *Id.* The court noted that ethical rules mandated that an attorney who represents an insured at the request of the insurer owes undivided fidelity to the insured, and that the attorney cannot reveal any information or conclusions derived therefrom to the insurer that might be detrimental to

the insured in any subsequent action. *Id.* The court found that the attorney who represented the minor insured should have notified the insurer that he could no longer represent it after he obtained "any information (as a result of his attorney-client relationship with [minor] ) that could possibly be detrimental to [minor's] interests under the coverage of the policy." *Id.* at 98. The court held, "When an attorney who is an insurance company's agent uses the confidential relationship between an attorney and a client to gather information so as to deny the insured coverage under the policy ... such conduct constitutes a waiver of any policy defense, and is so contrary to public policy that the insurance company is estopped as a matter of law from disclaiming liability under an exclusionary clause in the policy." *Id.* at 99.

In discussing the development of bad faith law, the *Rawlings* court stated: "The tort of bad faith developed as a response to insurance adjustment abuses in third-party bad faith situations. The early Arizona cases, *Parsons v. Continental National American Group* ... present typical third-party bad faith situations." 726 P.2d at 571 (internal citations omitted). The court in *Lloyd v. State Farm Mut. Auto. Ins. Co.*, 189 Ariz. 369, 943 P.2d 729, 737 (Ariz.Ct.App.1996) summarized *Parsons* as follows: "[A]lthough intentional act exclusion would have applied and thus incident was not covered, insurer was estopped to assert the exclusion; by placing its own interests before those of the insured while defending the action, it had not acted in good faith...."

In the present case, MPC asked Mr. Broening, the attorney it hired to represent Mr. Pang, for information regarding when the peer review committee met on the Williamson case and for other information. Mr. Broening's response indicates that MPC asked him to discover, at a minimum, when Dr. Pang first learned of the Williamson claim and when the peer review occurred. MPC requested that information after it opened a coverage investigation.

MPC spends much of its briefing arguing that no *Parsons* violation occurred here because Mr. Broening ultimately did not reveal any confidential or privileged information in his letter. The Court need not analyze whether Mr. Broening revealed any confidential information, and therefore whether a true *Parsons* violation occurred, because Dr. Pang does not argue that Mr. Broening acted inappropriately or violated his ethical duty of loyalty. Rather, Dr. Pang argues that MPC attempted to use Mr. Broening to gain information it might otherwise not be able to gain for use against Dr. Pang in the coverage dispute. Dr. Pang maintains that just because Mr. Broening didn't collude with MPC, doesn't change the fact that MPC put its own interests above those of Dr. Pang's in inappropriately requesting coverage information from Dr. Pang's attorney.

MPC contends it had legitimate reasons for requesting the information from Mr. Broening other than building its coverage case against Dr. Pang. That might be true, but a reasonable juror could infer from the facts that MPC wanted to get information, whether privileged or not, from Mr. Broening to use against Dr. Pang in its coverage investigation. Further, a reasonable juror could find that by attempting to use the relationship between Dr. Pang and his defense lawyer to build a coverage case against Dr. Pang, MPC did not "play fairly" with Dr. Pang; and thereby acted unreasonably and knew that it acted unreasonably. Dr. Pang has created an issue of fact regarding whether MPC put its own interests above Dr. Pang's by asking his attorney, Mr. Broening, for information about when Dr. Pang first learned of the

Williamson case and when the peer review occurred.

■■■ MPC alternatively argues that even if Dr. Pang has stated a claim for bad faith, his assertion of the attorney-client privilege should preclude him for pursuing the claim. MPC argues it cannot discover whether Mr. Broening and Dr. Pang had confidential conversations regarding MPC's information requests because Dr. Pang has asserted the attorney-client privilege. MPC contends that Dr. Pang cannot use the privilege as both a sword—by claiming a *Parsons* violation—and as a shield—by preventing MPC from discovering what conversations Mr. Broening and Dr. Pang had. *See State of Arizona v. Wilson,* 200 Ariz. 390, 26 P.3d 1161, 1167 (Ariz.Ct.App.2001).

MPC's argument is misplaced. Dr. Pang's counterclaim for bad faith hinges on the actions of MPC in requesting information, not on the actions of Mr. Broening. Whether Mr. Broening and Dr. Pang had privileged conversations as a result of MPC's inquiries is irrelevant. Dr. Pang argues that MPC violated its duty of good faith just by asking for the information. The Court finds that Dr. Pang's assertion of the attorney-client privilege regarding the conversations between Mr. Broening and Dr. Pang does not preclude Dr. Pang from pursuing his counterclaim for bad faith.

## B. Punitive Damages

■■■ An insured may recover punitive damages on a bad faith claim. *See, e.g., Walter v. Simmons,* 169 Ariz. 229, 818 P.2d 214, 225–26 (Ariz.Ct.App.1991). The insured must prove entitlement to punitive damages by clear and convincing evidence. *Id.* at 225. Proving punitive damages requires something more than the conduct

necessary to establish the tort of bad faith. *Id.* Merely acting in bad faith toward the insured, without something more, does not warrant the imposition of punitive damages. *Lange v. Penn Mut. Life Ins. Co.,* 843 F.2d 1175, 1182 (9th Cir.1988). Specifically, the insured must prove that the insurer's wrongful conduct was guided by an "evil mind." *Walter,* 818 P.2d at 225. An insured can prove an insurer's evil mind by evidence that the insurer either: "(1) intended to injure the [insured], (2) was motivated by spite or ill will, or (3) acted to serve [its] own interest, having reason to know and consciously disregarding a substantial risk that [its] conduct might significantly harm [insured]." *Id.*

■■■ The test for punitive damages focuses on the insurer's attitude and conduct. *Lange,* 843 F.2d at 1182–83. The insured may recover punitive damages when, "and only when, the facts establish that [the insurer's] conduct was aggravated, outrageous, malicious or fraudulent." *Id.* at 1183 (quoting *Rawlings,* 726 P.2d at 578). The insurer must be "consciously aware of the evil of his actions, of the spitefulness of his motives or that his conduct is so outrageous, or intolerable in that it creates a substantial risk of tremendous harm to others" to demonstrate an evil mind. *Id.* (quoting *Linthicum v. Nationwide Life Ins. Co.,* 150 Ariz. 326, 723 P.2d 675, 679 (1986)).

■■■ The Court acknowledges that MPC may have exhibited a severe lack of judgment when it attempted to elicit coverage information from Dr. Pang's lawyer. MPC's conduct might support a finding of bad faith. But this case lacks the "something more" needed to recover punitive damages. MPC's decision to ask for some basic information from Mr. Broening does not rise to the level of an "evil mind." [3]

---

3. The fact finder could conclude that MPC knew Mr. Broening owed an undivided loyalty to Dr. Pang and that therefore MPC could trust that Mr. Broening would not reveal any privileged information.

No material evidence exists from which a reasonable juror could conclude that MPC knew of the *evil* of its actions, or that it acted from spite, or that MPC's conduct was so outrageous and intolerable that it presented an unacceptable risk of tremendous harm to Dr. Pang. The Court therefore grants summary judgment to MPC on the issue of punitive damages.

## V. CONCLUSION

The following issues remain for trial: 1) whether the potential claims question elicited a statement of fact or opinion or both; 2) whether Dr. Pang committed actual or legal fraud when he answered "No" to the potential claim question; 3) whether MPC would have approved the increased limits if Dr. Pang had reported the circumstances surrounding the Williamson surgery; 4) whether Dr. Pang intended to deceive MPC when he answered "No" to the hospital peer review committee question; 5) whether MPC would have increased Dr. Pang's policy limits if he had answered "Yes" to the peer review question; and 6) whether MPC violated its duty of good faith by asking Mr. Broening for information regarding when Dr. Pang first learned of the Williamson case and when the Williamson peer review took place.

Accordingly,

IT IS ORDERED granting partial summary judgment to Plaintiff/Counter–Defendant Medical Protection Company (Doc. # 175): 1) on the issue of materiality on its rescission claim and 2) on the issue of punitive damages on the bad faith counterclaim. The Court denies MPC's motion for summary judgment in all other respects.

IT IS FURTHER ORDERED granting partial summary judgment to Defendant/Counter–Plaintiff Dr. Pang (Doc. # 179): 1) on MPC's claim for partial rescission to the extent MPC bases its claim on Dr. Pang's answer to the non-hospital organization review question and 2) on the issue of legal fraud regarding the question about peer committee review. The Court denies Dr. Pang's Motion for Summary Judgment in all other respects.